**FOR PUBLICATION**                                                                                           **CLOSED**

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

_____

IN RE LUCENT TECHNOLOGIES, INC.,                      :            Case No. 00-cv-621 (JAP)
SECURITIES LITIGATION,                                             :
_____:


_____

WARREN F. REINHART and GERALD M.                   :
SMITH, On Behalf Of Themselves and A Class         :            Case No. 01-cv-3491 (JAP)
Of Persons Similarly Situated,                                      :
                           Plaintiffs,                                         :
            v.                                                                        :
                                                                                       :
LUCENT TECHNOLOGIES, INC., ET. AL.,              :
                           Defendants.                                       :
_____:


_____

SANDRA BALABAN, On Behalf of Herself and        :
and All Others Similarly Situated,                              :
                           Plaintiff,                                          :
            v.                                                                        :            Case No. 02-cv-4852 (JAP)
                                                                                       :
HENRY B. SCHACHT, RICHARD A. MCGINN,        :
DEBORAH C. HOPKINS, PAUL A. ALLAIRE,          :
BETSY S. ATKINS, CARLA A. HILLS,                      :
FRANKLIN A. THOMAS, JOHN A. YOUNG,            :
and LUCENT TECHNOLOGIES, INC.,                       :
                           Defendants.                                       :
_____:


_____

ARTHUR LAUFER, Individually and On Behalf       :
of All Others Similarly Situated,                               :
                           Plaintiff,                                          :            Case No. 01-cv-5229 (JAP)
            v.                                                                        :
                                                                                       :
LUCENT TECHNOLOGIES, INC., HENRY             :
SCHACHT and DEBORAH HOPKINS,                       :
                           Defendants.                                       :
_____:

---

| | |
|---|---|
| GEORGE PALLAS, Derivatively on Behalf of Nominal Defendant LUCENT TECHNOLOGIES, INC., : : : | Case No. 02-2460 (JAP) |

GEORGE PALLAS, Derivatively on Behalf of  :
Nominal Defendant LUCENT TECHNOLOGIES,  :    Case No. 02-2460 (JAP)
INC.,  :

        Plaintiff,  :

    v.  :
  :
HENRY B. SCHACHT, PAUL A. ALLAIRE,  :
CARLA A. HILLS, DONALD K. PETERSON,  :
FRANKLIN A. THOMAS, JOHN A. YOUNG,  :
DEBORAH C. HOPKINS and RICHARD A.  :
MCGINN,  :

        Defendants,  :
    -and-  :
LUCENT TECHNOLOGIES, INC., a  :
Delaware Corporation,  :
        Nominal Defendant.  :

---

EVA COOPER, Derivatively on Behalf of Nominal :
Defendant LUCENT TECHNOLOGIES,  :
INC.,  :    Case No. 02-4260 (JAP)

        Plaintiff,  :

    v.  :
  :
HENRY B. SCHACHT, PAUL A. ALLAIRE,  :
CARLA A. HILLS, DONALD K. PETERSON,  :
FRANKLIN A. THOMAS, JOHN A. YOUNG,  :
DEBORAH C. HOPKINS and RICHARD A.  :
McGINN,  :

        Defendants,  :
    -and-  :
LUCENT TECHNOLOGIES, INC.,  :
a Delaware Corporation,  :
        Nominal Defendant.  :

---

2

**APPEARANCES**

CRAVATH, SWAINE & MOORE
Paul C. Saunders, Esq.
Daniel Slifkin, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

LINDABURY, McCORMICK & ESTABROOK, P.A.
John H. Schmidt, Jr., Esq.
53 Cardinal Drive
Westfield, NJ 07091

       Counsel for Defendants Lucent Technologies, Inc.,
       Richard A. McGinn, Donald K. Peterson, and
       Deborah C. Hopkins


**For Plaintiffs in Case No. 00-cv-621 (JAP):**
MILBERG WEISS BERSHAD & SCHULMAN LLP
David J. Bershad, Esq.
Jerome M. Congress, Esq.
Elaine S. Kusel, Esq.
One Pennsylvania Plaza
New York, NY 10119-0165

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Max W. Berger, Esq.
Daniel L. Berger, Esq.
Steven B. Singer, Esq.
Jeffrey N. Leibell, Esq.
Javier Bleichmar, Esq.
1285 Avenue of the Americas
New York, NY 10019

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Erik Sandstedt, Esq.
220 St. Paul Street

Westfield, NJ 07090
    Co-Lead Counsel for the Plaintiff Class

**For Plaintiffs in Case No. 01-3491 (JAP):**
KELLER ROHRBACK, L.L.P.
Lynn Lincoln Sarko, Esq.
Britt Tinglum, Esq.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

KELLER ROHRBACK, L.L.P.
Ron Kilgard, Esq.
Suite 900, National Bank Plaza
3101 North Central Avenue
Phoenix, Arizona 85012

BERGER & MONTAGUE, P.C.
Todd S. Collins, Esq.
1622 Locust Street
Philadelphia, PA 19103

STULL, STULL & BRODY
Edwin J. Mills, Esq.
6 East 45th Street
New York, NY 10017

WEBER, GALLAGHER, SIMPSON, STAPLETON, FIRE
& NEWBY, LLP
E. Graham Robb, Esq.
1101 N. Kings Highway
Suite 405
Cherry Hill, NJ 08034
    Co-Lead Counsel for the ERISA Plaintiffs

O'MELVENY & MYERS, LLP
Robert N. Eccles, Esq.
Gary S. Tell, Esq.
1625 Eye Street, N.W.
Washington, D.C. 20006
    Lead Counsel for the ERISA Defendant

4

**For Plaintiffs in Case No. 02-cv-4852 (JAP):**
KAUFMAN GELBERT & BERN, LLP
Douglas M. Bern, Esq.
2 Executive Drive
Fort Lee, NJ 07024


WECHSLER HARWOOD LLP
Robert I. Harwood, Esq.
Samuel K. Rosen, Esq.
488 Madison Avenue
New York, NY 10022

Attorneys for Plaintiff

**For Plaintiffs in Case No. 01-cv-5229 (JAP)**:
SQUITIERI & FEARON, LLP
Olimpio Lee Squitieri, Esq.
One Gateway Center
Suite 2500
Newark, New Jersey 07102

KIRBY MCINERNEY & SQUIRE, LLP
Jeffrey H. Squire, Esq.
Ira M. Press, Esq.
Pamela E. Kulsrud, Esq.
830 Third Avenue
New York, New York 10022

Co-Lead Counsel for Plaintiffs

THE WEXLER FIRM
Kenneth A. Wexler, Esq.
Elizabeth Hartweg, Esq.
One North LaSalle Street
Chicago, IL 60601

Counsel for Plaintiffs

**For Plaintiffs in Case No. 02-2460 (JAP)**:
TRUJILLO RODRIGUEZ & RICHARDS LLC
Lisa J. Rodriguez, Esq.
8 Kings Highway West

Haddonfield, NJ 08033
                    Liaison Counsel

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield, Esq.
24570 Deep Neck Road
Royal Oak, MD 21662

SCHIFFRIN & BARROWAY, LLP
Richard S. Schiffrin, Esq.
Robert B. Weiser, Esq.
3 Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
                    Co-Lead Derivative Counsel

DONOVAN SEARLES, LLC
Michael D. Donovan, Esq.
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103

WEINSTEIN KITCHENOFF SCARLATO & GOLDMAN, LTD.
Robert S. Kitchenoff, Esq.
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
                    Other Derivative Counsel

John J. Pentz, Esq.
                    Counsel for Objector Edward Gordon

Stephen Tsai, Esq.,
                    Counsel for Objector Rinis Travel


**AMENDED OPINION**[1]

PISANO, District Judge.

**TABLE OF CONTENTS**

---

[1] This amended opinion is filed to reflect some changes in the attorney names listed in the "APPEARANCES" section.

6

I.  Introduction                                                                 Page 7
II. Discussion                                                                   Page 8
    A. Discretion and the Percentage-of-Recovery Preference          Page 8
    B. The *Gunter* Factors                                             Page 12
    C. The Fees and Expenses Applications at Issue                      Page 12
        1.  *In re Lucent Tech., Inc., Secs. Litig.*, 00-cv-621 (JAP) -
        On Behalf of The Common Shareholders                          Page 12
        2.  *Reinhart v. Lucent Techs., Inc.*, 01-cv-3491 (JAP) -
        Defined Contribution Employee Benefit Plan Plaintiffs         Page 36
        3. *Balaban v. Schacht*, 02-cv-4852 (JAP) -
        Lucent Note Holders Litigation                                Page 47
        4. *Laufer v. Lucent Techs., Inc.*, 01-cv-5229 (JAP) -
        Debt Securities Holders                                       Page 53
        5. *Pallas v. Schacht, et. al.*, 02-2460 (JAP) -
        The Derivative Plaintiffs                                     Page 61

III. Conclusion                                                                  Page 70

## I.  Introduction

One of the largest settlements in securities class action litigation history and particularly in post-Private Securities Litigation Reform Act ("PSLRA") times, the approximately $610 million[2] Gross Global Settlement ("Global Settlement") of what were originally fifty-three separate lawsuits against one-time telecommunications giant Lucent Technologies, Inc. ("Lucent"), and various current and former Lucent directors, officers, and employees is the backdrop for this Opinion.  *See* Stanford L. Sch. Sec. Class Action Clearinghouse, *at* http://www.securities.stanford.edu/ (listing the Lucent Global Settlement as second among the five

---

[2] The Global Settlement includes warrants to purchases shares of Lucent common stock. "A warrant is the right (but not the obligation) to buy usually one share of common stock at a specific price (exercise price) until a specific time (expiration date) . . . . In reality a warrant is more like a stock option." The Trader's Notebook, *What are Warrants?*, *at* http://www.tradersnotebook.com/warrants/warrants1.html. Because the warrant value increases as the stock price increases, the Global Settlement figure here is approximate.

largest settlements).[3]   In earlier opinions, the Court approved the settlements allocated from the

Gross Global Settlement to each group of Plaintiffs in *In re Lucent Technologies, Inc. Securities*

*Litigation.*, 00-cv-621 (JAP), *Reinhart v. Lucent Technologies, Inc.*, 01-cv-3491 (JAP), *Laufer v.*

*Lucent Technologies*, 01-cv-5229 (JAP)*,  Pallas v. Schacht*,  02-cv-2460 (JAP), *Cooper v.*

*Schacht*, 02-cv-4260 (JAP), and *Balaban v. Schacht,* 02-cv-4852 (JAP). *See In re Lucent Tech.,*

*Inc., Sec. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004); *Pallas v. Schacht*, No. 02-cv-2460 (D.N.J.

May 4, 2004)[4]; *Balaban v. Schacht*, No. 02-cv-4852 (D.N.J. April 23, 2004); *Laufer v. Lucent*

*Tech.*, No. 01-cv-5229 (D.N.J.  March 24, 2004); *Reinhart v. Lucent Tech., Inc.*, No. 01-cv-3491

(D.N.J. March 15, 2004).[5]  Here, the Court resolves the parties's respective applications seeking

attorney's fees and reimbursement of expenses in these cases.  For the reasons set forth below,

the applications for fees and expenses are granted in part and modified in part.  The Court's

conclusions are final, and a final Order accompanies this Opinion.

**II.  Discussion**

 The Court articulates the relevant standards and guidelines in making these fee and

expense determinations before examining the Plaintiff's application in each case.

**A.  Discretion and the Percentage-of-Recovery Preference**

The district court employs its discretion to fix the amount of attorney's fees and expenses.

---

[3]  The Stanford website reports the settlement value as $563 million. *See supra* n.1.

[4]  The *Pallas* and *Cooper* actions were consolidated.

[5]  The Court does not recite the particulars of each allocated settlement in this Opinion.
For a discussion and analysis of the facts and circumstances underlying each particular settlement
and the Court's approval of each, the Court relies on its earlier opinions and directs readers to
those Opinions.

*In re Gen. Motors Corp. Pick-Up Truck Prods. Liab. Litig.* ("*Gen. Motors*")*,* 55 F.3d 768, 783,

821 (3d Cir. 1995) (citing *Lindy Bros. Builders, Inc. v. Am. Radiator & Std. Sanitary Corp.,* 540

F.2d 102, 115 (3d Cir.1976)). Determining an appropriate award, however, is not an exact

science. *In re Computron Software, Inc.* ("*Computron*")*,* 6 F. Supp. 2d 313, 321 (D.N.J. 1998).

Rather, the facts of each case inform the amount of any award. *Id.*

      A district court must thoroughly analyze a fee application in a class action settlement. *See*

*Gen. Motors*, 55 F.3d at 819.  Its scrutiny remains probing even where the parties have consented

to a fee award.  *Id.* at 820 (explaining that consent is not determinative because of a "'danger . . .

that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in

exchange for red-carpet treatment for fees.'") (quoting *Weinberger v. Great N. Nekoosa Corp.*,

925 F.2d 518, 524 (1st Cir. 1991)); *see id.* at 819-20 (noting that a defendant's interests do not

eliminate this risk because "'a defendant is interested only in disposing of the total claim asserted

against it; . . . the allocation between the class payment and the attorney's fees is of little or no

interest to the defense.'")  (quotation omitted).  Therefore, a district court must be mindful to

guard against " any actual abuse or appearance of abuse capable of creating a public

misunderstanding." *Gen. Motors,* 55 F.3d at 920.

      The two approaches for determining the reasonableness of an attorney's fees request are

the lodestar method and the percentage-of-recovery method.  Each is appropriate in a particular

type of case. *Id.* at 821 (citation omitted). A court, first, must categorize the type of action before

it and then apply the corresponding method for awarding fees. *Id.*  Though only one of the

methods should serve as the primary basis for establishing the fee award, a "court may . . . , as a

check, want to use the lodestar method to assure that the precise percentage awarded does not

create an unreasonable hourly fee." *Id.* at 822.

The lodestar method, which multiplies the number of hours by an hourly rate appropriate for the region and the lawyer's experience, is proper in statutory fee-shifting cases. *See Gen. Motors,* 55 F.3d 821. Conversely, the percentage-of-recovery method is used in common fund cases, on the theory that class members would be unjustly enriched if they did not adequately compensate counsel responsible for establishing the fund. *See id.* (citation omitted). The Third Circuit and this Court have repeatedly approved and applied the percentage-of-recovery method in common fund securities fraud cases. *See, e.g., In re Cendant Corp. Litig.* ("*Cendant*"), 264 F.3d 201, 220 (3d Cir. 2001) ("For the past decade, counsel fees in securities litigation have generally been fixed on a percentage basis rather than by the so-called lodestar method."); *In re AremisSoft Corp. Sec. Litig.* ("*AremisSoft*"), 210 F.R.D. 109, 128 (D.N.J. 2002) (observing that "the percentage-of-recovery method is used in common fund cases on the theory that class members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund."); *see also* 15 U.S.C. § 78u-4(a)(6) (providing that a fee award should constitute "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.") Certainly while the Third Circuit has been partial to this method in common fund cases, *see id.* at 821-22, neither the Circuit nor the United States Supreme Court requires courts to exclusively use the percentage-of-recovery method. *See id.* at 821 (allowing a court the discretion to select the method) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)).

Respecting the Circuit's preference, this Court relies on the percentage-of-recovery

method in all of the cases before it.[6] *See In re Ikon Office Solutions, Inc. Sec. Litig.* (*"Ikon"*)*,* 194 F.R.D. 166, 194 (E.D. Pa. 2000) (applying the percentage method in a "paradigmatic common fund case")  (citing *In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 852, 860 (W.D. Pa. 1995)); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (recognizing that an attorney who maintains a suit that results in a fund or benefit in which others have a common interest may obtain fees from that common fund); *AremisSoft*, 210 F.R.D. at 128 ("Attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services offered to the settlement fund under the common fund doctrine.") (citation omitted).  The fact that case law makes dubious the application of the lodestar method in a class action also supports the Court's election of the percentage-of-recovery method.[7]  *See Ikon*, 194 F.R.D. at 194 (noting that the lodestar method has "come under attack" because it may encourage attorneys to delay settlement to maximize fees and strains the judicial system by compelling courts to review the propriety of thousands of billable hours) (citing *In re Prudential Ins. Co. of Am. Sales Practices* (*"Prudential II"*), 148 F.3d 283, 333 (3d Cir. 1998)).

Applying the percentage-of-recovery approach, a court, first, must value the proposed settlement and, second, decide what percentage of the settlement should be awarded as fees. *Gen. Motors,* 55 F.3d at 822.  In valuing a settlement offer, a district court must "determine a precise valuation of the settlement on which to base its award." *Id.*   Though this is a rigorous task, "[a]t the very least, the district court . . . needs to make some reasonable assessment of the settlement's

---

[6]  The cases before the Court are common fund cases because the fees and the award stem from the same source, and the fees are based on a percentage of either the Global Settlement or the particular settlement in each action.

[7]  All but *Pallas* and *Cooper* are class actions.  They are derivative shareholder lawsuits.

11

value." *Id.*; *see also Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995)

("[W]hen parties negotiate a settlement they have far greater control of their destiny than when a

matter is submitted to a jury.  Moreover, the time and expense that precedes the taking of such a

risk can be staggering.  This is especially true in complex commercial litigation."), *aff'd,* 66 F.3d

314 (3d Cir. 1995). A court also must specify the percentage used in calculating the fee award.

*Gen. Motors,* 55 F.3d at 822, though there is no set standard for determining a reasonable

percentage.  As a general matter, awards calculated under the percentage-of-recovery method can

widely range from nineteen percent to forty-five percent of a settlement fund. *Computron,* 6 F.

Supp. 2d at 322.

### B.  *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) - The Gunter Factor Analysis

Particularly in a common fund case, a district court should consider several factors in

awarding fees to determine if a requested fee is appropriate. *See Gunter,* 22 3 F.3d at 195 n. 1;

*see also In re Safety Components, Inc., Sec. Litig.* ("*Safety Components*")*,* 166 F. Supp. 2d. 72,

93-94 (D.N.J. 2001). These factors include:

> (1) the size of the fund and the number of persons benefitted;
> (2) the presence or absence of substantial objections by class
> members to the fee amount; (3) the skill and efficiency of counsel;
> (4) the complexity and duration of the action; (5) the risk of nonpayment;
> (6) the amount of time that counsel spent on the case; and (7) awards in
> similar cases.

*Gunter*, 223 F.3d at 195 n.1 (citations omitted).  These factors "need not be applied in a

formulaic way" because "in certain cases, one factor may outweigh the rest." *Gunter,* 223 F.3d at

195 n.1.

### C. The Fee and Expense Applications at Issue

**1.  *In re Lucent Tech., Inc. Secs. Litig.*, 00-cv-621 (JAP) - On Behalf of The Common Shareholders**

The firms Bernstein Litowitz Berger & Grossmann LLP and Milberg Weiss Bershad Hynes & Lerach LLP serve jointly as Lead Counsel ("Common Shareholders Lead Counsel") in this case.  The Common Shareholders Class will receive a combination of cash, stock, and warrants valued at approximately $517 million, the sum allocated to this Class from the Global Settlement Fund.  Common Shareholders Lead Counsel, on behalf of all Plaintiffs's Counsel, request 17% of the $517 million, or $87.89 million at the current value of the fund,[8] to be paid in cash and securities in the same proportion as they comprise the Gross Fund.  Additionally, Common Shareholders Lead Counsel also seek $3.5 million to reimburse them for expenses incurred in handling this consolidated class action.

Under PSLRA, a fees award negotiated between a properly-appointed lead plaintiff and properly-appointed lead counsel as part of a retainer agreement enjoys a presumption of reasonableness.  *Cendant*, 264 F.3d at 282 (citation omitted).  This presumption preserves the lead plaintiff's role as "the class's primary agent vis-a-vis its lawyers."  *Id.*  Absent unusual and unforeseeable changes, courts should honor that presumption.  *Id.* at 283.   Even where changed circumstances do not exist, courts must determine whether the presumption is rebutted by a "prima facie showing that the retained agreement fee is clearly excessive."  *Id.*  In so evaluating,

---

[8] The Settlement Fund consists of $113,400,000 in cash, $246,750,000 worth of additional cash or shares of Lucent common stock, $24,000,000 worth of shares of Avaya, Inc. common stock, and warrants to purchase 200 million shares of Lucent common stock at a price of $2.75 per share, which, according to Lucent, were worth $128,000,000 at the end of its fiscal quarter (i.e., as of June 30, 2003), plus any interest that accrues thereon, and up to $5 million to cover the costs of providing notice to the Class and administering the Gross Global Settlement Fund.

courts should apply the factors set forth in *Gunter*, 223 F.3d at 195 n.1.  Consistent with the

PSLRA, the aim of this factor inquiry is "not to assess whether the fee request is reasonable;

instead, the goal is to determine whether the presumption of reasonableness has been rebutted."

*Cendant*, 264 F.3d at 284.

Common Shareholders Lead Counsel's request is presumptively reasonable.  *See*

*Cendant*, 264 F.3d at 282. The Two Lead Plaintiffs, Teamsters Locals 175 & 505 D & P Pension

Trust Fund (the "Pension Trust Fund") and The Parnassus Fund and Parnassus Income

Trust/Equity Income Fund ("Parnassus"), were properly appointed under the terms of the

PSLRA.   Despite that Common Shareholders Lead Counsel was initially appointed as a result of

sealed-bid auctions, a method that the Third Circuit now prohibits, each Lead Plaintiff has

approved the selection of Lead Counsel.  *See Cendant*, 264 F.3d at 273-74, 279-80 (holding that

the district court abused its discretion in conducting an auction to appoint lead counsel, yet

concluding that the error was harmless because the selected law firms were the same as those the

Lead Plaintiff initially sought for appointment).  The Lead Plaintiffs have worked with Common

Shareholders Lead Counsel throughout this action.  More specifically, Lead Plaintiffs have

reviewed the fee application, monitored their representation, and been informed of litigation risks

as well as benefits.  Common Shareholders Lead Counsel accepted this case on a contingent

basis.  Though each of the Lead Plaintiffs initially signed separate retainer agreements, they

negotiated a revised fee agreement with Common Shareholders Lead Counsel when the case

concluded to reflect the evolution of the case and in an effort to harmonize the terms of the two

original retainer agreements.  Lead Plaintiffs negotiated with Common Shareholders Lead

Counsel for considerable time to secure a fee of 17% for approval and recommendation to the

14

Court.  In fact, the lawyer for Parnassus, Steven J. Toll, Esq., of Cohen Milstein Hausfeld & Toll appeared at the Fairness Hearing on December 12, 2003, to elaborate on the negotiations that took place between the Lead Plaintiffs and Lead Counsel.  Mr. Toll represented that the Chairman of the Parnassus Fund is "comfortable with" the 17% request. (Transcript of Proceedings dated Dec. 12, 2003 at 88; *see id.* at 87-88.)  Accordingly, the Court shall presume reasonable this fee request, absent a finding that the fee is prima facie clearly excessive under the *Gunter* test.[9]

### A.  *Gunter* Analysis

### (1)  *Gunter Factor* - Complexity and Duration of Litigation

In considering, first, the complexity and duration of the litigation, *see Gunter,* 223 F.3d at 195 n.1, 197 ("The complexity and duration of the litigation is the first factor a district court can and should consider in awarding fees."), the Court finds that the complex nature of this long-enduring litigation is without dispute.  This action involved an alleged massive fraud arising from a number of circumstances including: (1) Lucent's inability to keep pace with the industry in developing optical networking products capable of running at "OC-192" speed (the then product of choice for Lucent's potential customers); (2) widespread problems the Company was experiencing with a broad range of its other optical networking products; (3) the widespread problems throughout its product lines relating to product design, reliability, and timeliness of deliveries; and (4) problems with AT&T, Lucent's largest customer.  Instead of reducing its

---

[9]  No other Plaintiff involved in any of the cases before the Court asserts an entitlement to a presumption of reasonableness under the PSLRA.  However, the Court assumes in each of the cases before it that counsel negotiated fees with their respective clients.  Even so assuming, the Court must still apply the *Gunter* factors to determine the propriety of the fees request.

public projections or revenue and earnings to reflect the Company's true financial condition, Defendants allegedly misrepresented the demand for Lucent's products. According to the Plaintiffs, the Company improperly booked hundreds of millions of dollars of revenue as " sales." In short, this was an exceptionally intricate case involving both sophisticated issues of fact and law, many of which Defendants vigorously challenged.

Additionally, the settlement negotiations were inherently complicated, and Common Shareholders Lead Counsel performed above and beyond the call of duty in all facets of the negotiations process. The negotiations continued between September 2002 and March 2003, when the Defendants and Common Shareholders Lead Counsel reached an agreement in principle. After Common Shareholders Lead Counsel agreed to a settlement for its client, the Class, they then negotiated with Counsel for Plaintiffs in all of the other Lucent-related actions to establish the specific terms of each settlement and to allocate the funds within the Global Settlement. (*See generally* Agreement Re: Global Settlement of Lucent Litigations Exs. 1-7.) The Court cannot overstate that Common Shareholders Lead Counsel provided immeasurable assistance to the Court throughout this stage of the negotiations as well.

The duration of this litigation also favors the fees award. Filed in January 2000, the case proceeded for nearly four years before it was resolved. After, the Plaintiffs learned that the scope and the nature of the alleged fraud was much broader than initially contemplated. Following an extensive investigation, Common Shareholders Lead Counsel filed five consolidated amended complaints. Common Shareholders Lead Counsel estimates that a trial would have required tens of thousands of additional hours of work. To be sure, this is not hyperbole - Lead Counsel has already devoted more than 61,000 hours to this case for, among other things, discovery

16

investigations, the service of forty-two subpoenas that produced approximately three million pages of discovery, a considerable motion practice, and its deposition preparations.   It is likely, too, that additional, significant work will be necessary to administer the settlement, yet another time-consuming task that Common Shareholders Lead Counsel has agreed without pause to perform.   Overall, this factor supports the fees request.

### (2) *Gunter* Factor - Presence or Absence of Substantial Objections

The second *Gunter* factor is "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter,* 223 F.3d at 195 n.1.  As evidenced by the minimal number of objections received, the Class's reaction supports the presumption of reasonableness.  Consistent with the Court's Preliminary Approval Order, Lead Counsel took steps to mail approximately 800,000 copies of the Notice to potential Class Members.  By November 26, 2003, more than 2.98 million notices had been mailed to potential Class Members.  From this group, only about nine people have objected to the fees application. One objector, Martha W. Hutson, who appeared at the Fairness Hearing on December 12, 2003 to primarily challenge the notice of the Settlement objected tangentially to the requested attorney's fees.[10] (*See* Transcript of Proceedings dated December 12, 2003 at 31 ("[I]t would be easier to justify the requested attorney's fee of more than $87 million if the [S]ettlement [A]greement also provided all [C]lass [M]embers with injunctive relief.")) While the Court has considered these objections and does not in any way diminish the concerns voiced

---

[10] The Court previously found that the "Notice fully and fairly informed Class Members of the Settlement terms, the fees application, and their rights to respond to either and/or both . . . [and] that Notice was given consistent with the terms of the Preliminary Approval Order, and Class Members were afforded a fair opportunity to object or opt-out." *In re Lucent Tech., Inc.*, *Sec. Litig.*, 307 F. Supp. 2d 633, 643 (D.N.J. 2004)

within them, the Court concludes that the lack of a significant number of objections is strong evidence that the fees request is reasonable, *see In re Cendant Corp. Deriv. Action Litig.*, 232 F. Supp. 2d 327, 338 (D.N.J. 2002) (noting that an extremely small number of complaints regarding the proposed fees favors approval of the requested fees). The number is particularly telling because the Class includes hundreds of large, sophisticated institutional investors who, collectively, purchased a substantial percentage of Lucent common stock during the Class Period. Thus, this factor also respects the presumption.

### (3) *Gunter* Factor - Skill and Efficiency of Counsel

The third factor of  the *Gunter* approach requires a court to look at "the skill and efficiency of the attorneys involved." *Gunter,* 223 F.3d at 195 n.1;  *id.* at 198 (stating that the goal of the percentage fee-award approach is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation.")  Indeed, "the results obtained" for a class evidence the skill and quality of counsel. *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 149 (E.D. Pa. 2000).

Again, the Court does not exaggerate in stating that Common Shareholders Lead Counsel was at the helm of the entire Global Settlement process.  Their efforts resulted in an extraordinary settlement with a unique structure that includes stock, cash, and warrants.  Using its creative vein, Common Shareholders Lead Counsel negotiated for the warrants as part of the settlement to prevent Lucent from benefitting from its compromised financial condition, yet secure for the Class a significant upside potential in the event that Lucent's condition improves.

 Given Lucent's precarious financial status at all times relevant to this litigation, the Company's ability to pay was an actual and vital consideration for any settlement.  Critical to the

negotiations as well, Lucent agreed to settle this matter only if it could settle several, related actions then pending against the Company.  For the sole purpose of evaluating Lucent's financial condition, the Court created an "Ability to Pay Committee" comprised of several attorneys who participated in the Global Settlement negotiations, namely, David J. Bershad, Esq. (Case No. 00-621), Daniel L. Berger, Esq. (Case No. 00-621), Olimpio Lee Squitieri, Esq. (Case No. 01-5229), and Todd Collins, Esq. (Case No. 01-3491).  This Committee retained experts to study and produce opinions on Lucent's financial capabilities.  While all Committee Members, no doubt, well served the Court, Messrs. Bershad and Berger, the two main attorneys for the Common Shareholders, primarily and meaningfully influenced the Committee's work, investigating closely with their experts to learn the true limits and constraints on any possible settlement.  The result was Common Shareholders Lead Counsel's proposal that maximized the recovery for the Class **and** permitted Lucent to continue its operations and efforts towards regaining financial progress. They successfully negotiated approximately 83% of the Gross Global Settlement for the Settlement of this particular action, No. 00-621.  But their monumental task did not end there. After the Common Shareholders Lead Counsel and Lucent agreed to the Gross Global Settlement sum, Common Shareholders Lead Counsel, once again, retrieved its laboring oar to negotiate with counsel for all of the other Global Settlement participants and ultimately allocated monies from that sum to those participants.

    As Common Shareholders Lead Counsel point out in this Application, their efforts are laudable as well because they achieved results without the aid of a governmental investigation. *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) ("*Rite Aid I*") (noting the skill and efficiency of counsel and the successful results "in a litigation that was far

ahead of public agencies like the Securities and Exchange Commission and the United States

Department of Justice, which long after the institution of this litigation awakened to the concerns

that plaintiffs's counsel first identified . . . .") Though an SEC investigation concerning Lucent

was ongoing, it neither prompted this litigation nor assisted Common Shareholders Lead Counsel

in handling this matter.

The quality and vigor of opposing counsel is also relevant in evaluating the quality of the

services provided by Common Shareholders Lead Counsel. *See, e.g.*, *Ikon*, 194 F.R.D. at 194; *In

re Warner Communications. Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of

opposing counsel is also important in evaluating the quality of plaintiffs' counsel's work.")

(citation omitted), *aff'd*, 798 F.2d 35 (2d Cir. 1986).  The law firms of Cravath Swaine & Moore

("Cravath") and Lindabury McCormick & Estabrook superbly represented the Defendants.   In

particular, the Cravath firm, which served as Lead Counsel for the Defendants, is one of the

premier law firms in the world, with a well-rooted reputation for exceptional legal services.  That

firm routinely represents some of the most sophisticated clients in the world in defense of

putative class action securities litigations.  Consummate professionals, the attorneys from

Cravath were meticulously prepared and exceptionally skilled at all times before this Court.   If

necessary, they were poised to try the case and present a formidable defense on both the liability

and damages claims.  The fact that Common Shareholders Lead Counsel for the Plaintiffs

obtained a favorable settlement from parties represented by awesome adversaries underscores the

quality of their representation.

Ultimately, too, the result itself evidences counsel's skill and efficiency. *See AremisSoft*,

210 F.R.D. at 132 (noting "the single clearest factor reflecting the quality of the class counsel's

services to the class are the results obtained."); *Safety Components.,* 16 F. Supp. 2d at 97

(considering "excellent result achieved" under skill and expertise factor of analysis). This factor

thus supports the fees request.

### (4) *Gunter* Factor - Size of Fund and Number of Persons Benefitted

"[T]he size of the fund created and the number of persons benefitted," *Gunter,* 223 F.3d

at 195 n.1, is also a consideration.  In general, as the settlement fund increases, the percentage

award decreases. *In re Prudential Ins. Co. of Am. Sales Practices* ("*Prudential II*"), 148 F.3d

283, 339 (3d Cir. 1998); *see also Cullen,* 197 F.R.D. 136, 148 (E.D. Pa. 2000). The "basis for

this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely

a factor of the size of the class and has no direct relationship to the efforts of counsel."

*Prudential II*, 148 F.3d at 339 (citations omitted).

Common Shareholders Lead Counsel has ensured an enormous benefit to many in

negotiating for the Class such a substantial recovery against Lucent.   This is one of the largest

post-PSLRA securities settlements achieved, evidently second only to that in *Cendant*.  *See*

Stanford Law Sch. Sec. Class Action Clearinghouse Database at

http://securities.stanford.edu/top_ten_list.html (providing a top ten list of the largest class action

settlement suits).  The Settlement is, indeed, extraordinary because Lucent has vigorously denied

liability throughout this action and at all times was poised to offer viable defenses to the claims.

And, Lucent teetered on the brink of bankruptcy throughout this litigation and during settlement

negotiations.   Common Shareholders Lead Counsel ultimately secured a settlement that

compensates Class Members for their injuries yet enables Lucent to continue its operations and

work towards achieving stability and prosperity once again. *See AremisSoft*, 210 F.R.D. at 132

("In other words, rather than permitting litigation to destroy a business and shortchange investors, as securities class actions so often do, Plaintiffs' Counsel created a settlement that promotes a just result and furthers economic activity.")

Significantly, too, many will benefit from this settlement. The Class Members are all persons or entities who purchased Lucent common stock between October 26, 1999 and December 20, 2000 and suffered damages as a result. More than 2.98 million notices and proofs of claims have been mailed to potential Class Members. In this case, the size of the Fund and of the Class evidences Common Shareholders Lead Counsel's tremendous efforts in negotiating this Settlement.

This factor favors the presumption that the requested fee is reasonable.

### (5) *Gunter* Factor - Risk of Nonpayment

The fifth factor under *Gunter* is "the risk of nonpayment." *Gunter,* 223 F.3d at 195 n.1. This risk is high when a defendant is close to insolvency. *Id.* at 199. Likewise, the risk of nonpayment is "acute" where a defendant lacks "significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained." *Cullen,* 197 F.R.D. at 150.

A truly grave possibility of non-payment was the impetus for the settlement negotiations here. Suffering a dramatic drop in its stock price between December 2000 and October 2002, Lucent confronted a severely compromised status at all times relevant to this litigation. By October 2002, the stock price sunk to an all-time low of $0.58 per share. News articles in late 2002 forecasted that Lucent would be compelled to file for bankruptcy or reorganization. Thus, when the parties began to negotiate seriously, the Plaintiffs, with potentially years of vigorous, expensive litigation awaiting them, encountered a Company that was slowly, yet steadily

deteriorating.

When negotiations began, the Court appointed an "Ability to Pay Committee" to assess Lucent's capability to satisfy a judgment.  In fact, as a result of that Committee's work, the Court learned that Lucent could not fund a sizeable cash settlement and could have filed bankruptcy at any moment during the litigation.  Moreover, Lucent agreed to settle only if it could achieve a global resolution of Lucent-related lawsuits; indeed, this result was ultimately reached here.  If this case had not settled, the Class would have continued to spend significant monies and thus would have reduced considerably the net recovery for the Class.  Of all the Plaintiffs involved in the various Lucent-related litigations pending before this Court, this particular Class faced the greatest risks because of the magnitude of the claims, the challenging proofs required, and the overall precarious status of Lucent as an entity.

Furthermore, courts have recognized that the risk of non-payment is heightened in a case of this nature where counsel accepts a case on a contingent basis.  *See Gunter,* 223 F.3d. at 199 (noting that "the risk that counsel takes in prosecuting a client's case should also be considered when assessing a fee award").  Here, the intrinsically speculative nature of this contingent fee case enhances the risk of non-payment and bolsters the Court's analysis under this factor.

### (6) *Gunter* Factor - Amount of Time that Counsel Devoted to Case

The sixth *Gunter* factor is "the amount of time devoted to the case" by counsel. *Gunter,* 223 F.3d at 195 n. 1.  Making extraordinary efforts for the Class, Common Shareholders Lead Counsel has devoted to this litigation over 61,000 hours and has advanced more than $3.74 million in expenses since it was filed.  Common Shareholders Lead Counsel have engaged in comprehensive investigations and discovery for pleading purposes and motion practice.  Their

work has included hundreds of hours of intensive propriety investigations.   Plaintiffs have served extensive document requests on Defendants and served forty-two third-party subpoenas on, among others, analysts who covered Lucent during the Class Period, Lucent's vendors, Lucent's auditor, Lucent's distributors, customers, and certain former Lucent employees. Common Shareholders Lead Counsel reviewed more than 2.5 million pages of documents produced by Defendants and more than 500,000 pages produced by third parties.   Forty-five attorneys participated in this massive document review.  Overall, an average of ten attorneys worked on a full-time basis for ten consecutive months between July 2001 and April 2002.

In addition to time spent reviewing all publicly available information, Common Shareholders Lead Counsel engaged both in-house and outside investigators, forensic accountants, investment bankers, and economic experts on damages in securities actions.  As a result of their initial investigations, Lead Counsel identified more than 200 witnesses with knowledge of relevant facts and conducted interviews with former Lucent employees, customers, and distributors.   Common Shareholders Lead Counsel has also used considerable time to prepare and oppose discovery and dispositive motions. Based on their tireless efforts, Plaintiffs ultimately filed five, consolidated amended complaints, the last of which withstood the Court's scrutiny when the Defendants challenged it with a well-briefed, persuasive motion to dismiss.

Finally, Common Shareholders Lead Counsel is handling all of the administrative tasks related to the Global Settlement.  In so handling, they will assume, quite obviously, a substantial amount of work in administering the settlement.  Without question, they have dedicated very significant time, labor, resources, and expenses not just to their own client's case, but also to the Global Settlement overall and all steps taken towards resolving other Lucent-related litigations.

24

This factor overwhelmingly favors the Settlement.

### (7) *Gunter* Factor - Awards in Similar Cases

In evaluating Common Shareholders Lead Counsel's request for 17%, the Court must consider awards in similar cases. *Gunter,* 223 F.3d at 195 n.1.   Courts should not adhere to a formulaic approach in determining the appropriate range for fee awards, but must consider the relevant circumstances on a case-by-case basis.  *In re Cendant PRIDES Litig.,* 243 F.3d 722, 736 (3d Cir. 2001); *AremisSoft*, 210 F.R.D. at 133 (citation omitted). While percentages awarded have varied considerably, most awards range "from nineteen percent to forty-five percent of the settlement fund ."*In re Cendant PRIDES Litig.,* 243 F.3d at 736 (3d Cir. 2001); *Smith v. First Union Mortgage Corp.,* No. 98-5360, 1999 WL 509967, at * 4 (E.D. Pa. July 19, 1999); *In re Computron Software* ("*Computron*")*,* 6 F. Supp. 2d 313, 322 (D.N.J. 1998); *cf. Ikon,* 194 F.R.D. at 194 (concluding that while "[t]he median in class actions is approximately twenty-five percent, . . . awards of thirty percent are not uncommon in securities class actions.") (citing *Ratner v. Bennett,* No. 92-4701, 1996 WL 243645, at *8 (E .D. Pa. May 8, 1996)).  For example, more than twenty relatively recent class action decisions in the Third Circuit reflect fee awards between 33 1/3% and 22.5%:

| Case | Recovery | % Awarded |
|---|---|---|
| 1. *In re MobileMedia Sec. Litig.*, Civ. No. 96-5723 (D.N.J. Feb. 24, 2000) | $26.95 million | 33.33% |
| 2. *In re PNC BankCorp Sec. Litig.*, Civ. No. 94-1961 (W.D. Pa. Sept. 25, 1998) | $5.45 million | 33.33% |
| 3. *In re PNC Sec. Litig., Civ. No.* 90-0592 (W.D. Pa. Dec. 6, 1993) | $6.3 million | 33.33% |
| 4. *In re Greenwich Pharm. Sec. Litig.*, No. 93-3071, 1995 U.S. Dist. LEXIS 5717 (E.D. Pa. April 25, 1995) | $4.375 million | 33.33% |
| 5. *In re Inacom Corp. Sec. Litig.*, No. 00-701 (D. Del. Jan. 14, 2003) | $15.95 million | 33.33% |
| 6. *Fields v. Biomatrix, Inc.*, No. 00-3541 (D.N.J. Dec. 2, 2002) | $2.45 million | 33.33% |
| 7. *In re Gen. Instrument Sec. Litig.*, Civ. No. 01-3051, 2001 U.S. Dist. LEXIS 21578 (E.D. Pa. Dec. 27, 2001) | $48 million | 33.33% |
| 8. *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001) | $4.5 million | 33.33% |
| 9. *In re Schein Pharm. Inc. Sec. Litig.*, No. 98-4311 (D.N.J. Dec. 7, 2000) | $8 million | 33.33% |
| 10. *DiCiccio v. Am. Eagle Outfitters, Inc.*, Civ. No. 95-1937 (W.D. Pa. Dec. 12, | $1.95 million | 33.33% |

| | | |
|---|---|---|
| 1996) | | |
| | $7.2 million | 33% |
| 11. *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000) | | |
| | $24 million (hypothetical value) | 33% |
| 12. *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) | | |
| | $5.75 million | 33% |
| 13.  *In re Unisys Corp. Sec. Litig.*, Civ. No. 99-5333, 2001 U.S. Dist. LEXIS 20160 (E.D. Pa. Dec. 6, 2001) | | |
| | $8 million | 30% |
| 14. *In re ATI Techs., Inc., Sec. Litig.*, Civ. No. 01-2541, 2003 U.S. Dist. LEXIS 7062 (E.D. Pa. April 28, 2003) | | |
| | $81 million | 30% |
| 15. *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (M.D. Pa. Jan. 4, 2001) | | |
| | $111 million | 30% |
| 16. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | | |
| | $3.75 million | 30% |
| 17.  *In re Cell Pathways Inc. Sec. Litig.*, No. 99-752, 2002 U.S. Dist. LEXIS 18359 (E.D. Pa. Sept. 24, 2002) | | |
| | $193 million | 25% |
| 18.  *In re Rite-Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) | | |
| | $126.6 million | 25% |
| 19.  *In re Rite-Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603 (E.D. Pa. 2003) | | |

| | | |
|---|---|---|
| 20. *In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313 (D.N.J. 1998) | $15 million | 25% |
| 21. *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) | $44.5 million | 22.5% |

(Decl. in Support of Pl.'s Counsel's Motion for Final Approval of Class Action Settlement & Plan of Allocation & App. For an Award of Attorney's Fees & Reimbursement of Expenses (hereinafter "Coffee Decl.") ¶ 24 & Table 6.)

   More generally, where cases involving comparable risks to the ones in this matter have settled for more than $100 million, courts have typically awarded fees in the range of 25% to 30%:

| Case | Recovery | % Awarded |
|---|---|---|
| 1. *In re Rite Aid Corp. Sec. Litig.* (*Rite Aid II*), 269 F. Supp. 2d 603 (E.D. Pa. 2003) | $126 million | 25% |
| 2. *In re Rite Aid Corp. Sec. Litig.* (*Rite Aid I*), 146 F. Supp. 2d 706 (E. D. Pa. 2001) | $193 million | 25% |
| 3. *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 million | 28% |
| 4. *Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D. Cal. Nov. 2, 1999) | $132 million | 30% |
| 5. *In re Ikon Office Solutions, Inc. Sec. Litig.*,194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30% |
| 6. *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) | $104 million | 30% |
| 7. *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) | $190 million | 25% |
| 8. *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30% |
| 9. *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36% |

| 10. *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999) | $116 million | 27.5% |
|---|---|---|
| 11. *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 million | 30% |
| 12. *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F. Supp. 97 (S.D.N.Y. 1996) | $110 million | 27% |

The Court's examination of the fees awards in a significant number of class actions both within and outside of the Third Circuit easily reveals that Common Shareholders Lead Counsel's request is entirely reasonable and, given their work, perhaps quite modest for two reasons. First, Common Shareholders Lead Counsel played a critical role in all negotiations that ultimately resulted in the Global Settlement.   More often than not, Common Shareholders Lead Counsel wore multiple hats, proverbially.   For example, they were the legal representatives of the Class in this common shareholders litigation.  They were Court-appointed members of the "Ability to Pay Committee" who assumed an active, rigorous role on the Committee.  They were the chief mediators for all of the Plaintiffs participating in the Global Settlement.  They were the negotiators who worked to allocate the Global Settlement monies among the various Lucent-related litigations. They are the administrators of the Global Settlement and will ultimately ensure that the settlement proceeds reach the injured parties.  And, at all times, they have served collectively as an insightful, thoroughly prepared liaison to the Court.

Second, the award is easily justified when juxtaposed against the range of fees commonly awarded in this type of action and particularly in the Third Circuit.  The requested 17% fee is

considerably less than the percentages awarded in nearly every comparable case.  Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request.

Moreover, as Common Shareholders Lead Counsel observes, the 17% fee is also considerably less than what is typically earned in contingent fee arrangements negotiated in non-class action litigation.  If this were a non-class action case, the customary contingent fee would likely range between 30% and 40% of the recovery.  *See, e.g., Ikon*, 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs'[s] counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *see also Blum v. Stenson*, 465 U.S. 886, 903 n.* (1984) (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.") Thus, a percentage-based fee of 17% is also reasonable because it, in fact, falls notably below what likely would have been privately negotiated to induce Common Shareholders Lead Counsel to undertake the risks of initiating and prosecuting this action. *See AremisSoft*, 210 F.R.D. at 132 (noting that "[t]he Circuit has explained that the goal of the percentage fee-award device is to ensure that competent counsel continue to undertake risky, complex and novel litigation.")

The Court thus concludes that 17% of the recovery, or $87.89 million, well compensates Common Shareholders Lead Counsel for their services.   Not only does the application of the *Gunter* factors fail to rebut the presumption that the fee award sought is reasonable, but it ensures as well that the 17% proposed fee is wholly fair and reasonable.  Therefore, the Court approves

Lead Counsel's Fee Application.

## B. Application of the Lodestar Recovery Method

Though the Court is satisfied that its fees calculation is appropriate, it nonetheless will cross-check its result under the percentage-of-recovery method by applying the lodestar method. A court may check its percentage recovery determination against a lodestar method calculation to assure that the percentage awarded is not an unreasonable hourly fee. *Gen. Motors,* 55 F.3d at 822; *Safety Components,* 166 F. Supp. 2d. at 102.  A court determines "an attorney's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter,* 223 F.3d at 195 n.1.  To effectively examine the lodestar factor, a court "should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a reasonable hourly rate would be for such services." *Id.* at 199-200. A court may then multiply the lodestar calculation to reflect "the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *Safety Components,* 166 F. Supp. 2d at 102 (citations omitted); *see also In re Prudential,* 148 F.3d at 340-41. "After arriving at this lodestar figure, the district court may, in certain circumstances, adjust the award upward or downward to reflect the particular circumstances of a given case." *Gunter*, 223 F.3d at 195 n.1 (citations omitted).

The attorneys who have served as Common Shareholders Lead Counsel for the Class have devoted cumulatively 61,354 hours in handling this action.  The Court multiplies the number of hours devoted to the case by the average rates of the most senior lawyers from each of the Lead Counsel firms, which is $672.50 per hour, to arrive at a lodestar fee of $41,260,565.

*Id.*[11]  *See Cendant PRIDES*, 243 F.3d at 742.  Thus, the Court's calculation represents a 2.13 multiplier.  Since "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," *Krell v. Prudential*, 148 F.3d at 341 (citations omitted), the Court finds that the award calculated, $87.89 million, is appropriate. *See also* Coffee Decl. ¶ 31 & Table 7: Recent Multipliers (providing a table of eighteen cases decided between 1991 and 2003 that apply a multiplier above or around four.)

### C.  The Objections and the Coffee Declaration

The Court's decision accounts for the individual objections to the 17% fees award in this case and the Plaintiffs's response to those objections.  To be sure, the Court does not lightly treat the objections of the shareholders and has examined each.  That being said, however, the Court reiterates that the proposed fee award satisfies the standards currently employed by courts within the Third Circuit.

And, in rejecting the objections overall, the Court accords substantial weight to Plaintiffs's expert, John C. Coffee, Jr., who submitted a Declaration in Support of Plaintiff's Counsel's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Application For an Award of Attorney's Fees and Reimbursement of Expenses ("Coffee Declaration").  The Court finds the Coffee Declaration both instructive and persuasive on the

---

[11]  As Plaintiffs point out, the *Cendant PRIDES* Court, in fact, multiplies the total hours spent by the hourly rate of the single highest billing plaintiffs's attorney.  However, there, only one lead plaintiff firm was involved, and the senior attorney of that firm billed at $495 hourly.  Because two firms serve jointly as Common Shareholders Lead Counsel in this case, they have deemed it more appropriate to use a blended rate that averages the highest applicable rate for each of the two firms involved.  That blended rate is $672.50 per hour.  After that rate is multiplied by the 61,354 hours involved, the result is the $41,260,565 lodestar fee under the *Cendant PRIDES* methodology.  The result would be different if only the single highest, non-blended rate was used instead: the lodestar fee would be $42,641,030.

fees issue.

For example, Coffee demonstrates that "over the last five years (i.e. since 1998), all antitrust megafund awards have been over 20%, and sometimes over 30%, even in cases with recoveries exceeding or comparable to this one." (Coffee Decl. ¶ 14.)   Coffee specifically dispels one objector's claim that the proposed fee award is excessive by pointing out that the objector relies on outdated data and an overly broad study that covers every type of class action.  (Coffee Decl. ¶¶ 18-19, 20-21.)  Among other fee awards that support his ultimate opinion that the proposed 17% fee is reasonable if not modest, Coffee points to over twenty, relatively recent decisions in which fees between 33 1/3% and 22.5% have been awarded.  (Coffee Decl. ¶ 24 & Table 6.)  Coffee also observes that "a higher percentage fee award is appropriate in a higher risk case," (Coffee Decl. ¶ 26 (citations omitted)), pointing out that Common Shareholders Lead Counsel did not piggyback on any prior action brought by a governmental agency, that they financed the costs of the action out of the firm's capital or revenues for almost four years, and that Lucent's solvency was uncertain throughout the litigation, (Coffee Decl. ¶¶ 26-29.)

Additionally, Coffee responds directly to the objection filed by Edward Gordon, through his attorney, John J. Pentz, Esq..  Gordon essentially attempts to undermine Coffee's expertise by claiming that Coffee has previously endorsed an approach different than the one he takes here: "Professor Coffee recognizes the utility of a sliding scale and the impropriety of a routine application of a 25% benchmark to large recoveries."  Coffee explains, however, that Gordon misstates and misleads by quoting selectively from one of his prior articles.  (Coffee Decl.¶ 34.) Coffee clarifies that he has never sanctioned such an approach, explaining that he advocates that courts should listen to the market and observe what percentages sophisticated parties are

34

negotiating. (Coffee Decl. ¶ 34.)   According to Coffee, "What I actually argued in the column cited by Mr. Gordon is that when a market rate can be established by looking to the outcomes of recurrent negotiations between sophisticated lead plaintiffs and class counsel, it should supercede any presumptive benchmark."  (Coffee Decl. ¶ 34; see also *id.* ¶ 35.)

In sum, the Court determines that the fees award here reflects a careful consideration of all the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the lodestar methodology.  The award here is sufficiently appropriate for this particular case, given all of the facts and circumstances peculiar to this case. *See In re Cendant PRIDES Litig.,* 243 F.3d at 736 (guiding courts to not adhere to a formulaic approach in determining the appropriate range for fee awards, but, instead, to consider the relevant circumstances on a case-by-case basis.)  For all of the reasons stated above, the Court awards the proposed fee award of 17% or $87.89 million.

### D.  Reimbursement of Expenses

Common Shareholders Lead Counsel also seeks $3.5 million as reimbursement for expenses and costs incurred in handling this litigation.  Their submissions indicate that the expenses are adequately documented, reasonable, and appropriate for the litigation of this matter. *See Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995); *Cullen*, 197 F.R.D. at 151 (holding that photocopying expenses, telephone and facsimile charges, postage, and messenger and express mail service charges are reasonably incurred in prosecuting a weighty lawsuit.) Particularly, documented witness fees and costs associated with expert witnesses and consultants are often deemed incidental to litigation, *Cullen,* 197 F.R.D. at 151; *Safety Components,* 16 F. Supp. 2d at 108, and thus recoverable. None of the amounts claimed appear excessive. In fact,

Common Shareholders Lead Counsel represent that they have actually incurred more than $3.74 million in expenses. But in the Notice apprising potential class members of the Settlement, they informed that they would seek only up to $3.5 million for reimbursement of expenses. Accordingly, their request for reimbursement of expenses is approved.

In conclusion, the Court awards the proposed fee award of 17% or $87.89 million.  It further awards $3.5 million as reimbursement for expenses.

### 2. *Reinhart v. Lucent Techs., Inc.*, 01-cv-3491 (JAP) - Defined Contribution Employee Benefit Plan Plaintiffs

The Court appointed the law firms of Berger & Montague, P.C., Keller Rohrback, LLP and Stull, Stull & Brody as Co-Lead Counsel for the Defined Contribution Employee Benefit Lead Plaintiffs and designated Weber Gallagher Simpson Stapleton Fires & Newby LLP[12] as Local Counsel for the Defined Contribution Employee Benefit Lead Plaintiffs (hereinafter collectively "ERISA Counsel").  ERISA Counsel request fees in the amount of $13,800,000, or 20% of the cash component of the $69,000,000 settlement allocated to this action.  Plaintiffs contend that the settlement here is actually worth more based on therapeutic relief achieved, namely, structural changes to the Plans.  ERISA Counsel also request $550,512.57 as reimbursement for expenses incurred.  Lucent takes the position that ERISA Counsel's fee request is excessive essentially because the amount of work performed is not commensurate with the high percentage of recovery sought.

### A. *Gunter* Analysis

### (1) *Gunter* Factor - Complexity and Duration of Litigation

---

[12]  When the order appointing counsel was entered on October 24, 2001, the Weber Gallagher firm was known as Weber Goldstein Greenberg & Gallagher LLP.

The complexity and duration of the litigation, *see Gunter,* 223 F.3d at 195 n.1, 197, supports the fees request.  The ERISA Class is comprised of all participants in or beneficiaries of any of the Lucent Long Term Savings Plan for Management Employees (the "LTSPME"), the Lucent Retirement Savings and Profit Sharing Plan (the "RSP") and the Lucent Savings Plan (the "LSP") (collectively referred to as the Lucent "Plans") who made or maintained investments in the Lucent Stock Fund with respect to any of the Plans from December 31, 1999 to the present.  This case involved alleged breaches of fiduciary duties relevant to Lucent stock funds held by 401k plan participants.  This type of ERISA claims is novel - so much so, that Lucent and its insurers initially contended that the ERISA Class could not recover even if the Class proved the alleged fraud.  The ERISA Class, however, maintained its claims and sought monetary damages to recoup their losses and therapeutic changes to the structure of the Plans, particularly the LTSSP.  Proof that the therapeutic relief substantially increased the value of the settlement required ERISA Plaintiffs's Counsel to engage a financial expert, Professor Ramaswamy, to study and opine on complex stock valuation issues.

To be sure, the stakes of this ERISA litigation against Lucent were high; the Class needed a recovery substantial enough to compensate them for their severe losses, yet harmless enough to protect the Company as a viable corporate entity.  Complicating the stakes overall was the fact that, when this case was filed in July 2001, ERISA Counsel was without a single, favorable precedent as support.  (See ERISA Class Br. at 13 ("While ERISA Plaintiffs's Counsel believe they would be successful on the merits in this case, there is no single case which could be pointed to which has been successful through all appeals and which mirrored the factual scenario set out by the pleadings in this case.")

While the Court does not hesitate to determine that the case itself was complex, the Court cannot similarly conclude as to the settlement negotiations. The $69 million settlement allocated to the ERISA Class from the Global Settlement Fund is not the outcome of typically challenging arms-length negotiations between the parties, and ERISA Counsel essentially concedes just this. Lucent allocated the $69 million to the Gross Settlement Fund based on available coverage under its fiduciary liability insurance policies.[13]   Indeed, Edwin J. Mills, one of the attorneys for the ERISA Class, aptly explained to the Court that ERISA Counsel would have jeopardized their fiduciary duties to the Class had they accepted less than the potential coverage.  Thus, absent much struggle, ERISA Counsel gained $69 million for their client and resolved their case. Though the Court intends no disrespect for the abilities of or work performed by ERISA Counsel, the Court concludes nonetheless that the recovery for the ERISA Class is not the product of rigorous or complex negotiations between the parties.

This factor thus does not well support the fees request.

### (2) *Gunter* Factor - Presence or Absence of Substantial Objections

The objections to the fee request, *Gunter,* 223 F.3d at 195 n.1, must also be considered. On October 7, 2003, 136,675 individual notices were mailed to ERISA Class Members. Subsequently, additional individual notices were mailed.  Summary notice of the proposed settlement and fees and expenses request was published in *USA Today* on October 16, 2003.  Of the approximately twenty-five objections to the ERISA Class settlement, the Court, reading most liberally the objections, construes approximately twelve to fifteen of those as objections to the

---

[13]   The question of whether the fiduciary policy limits, in fact, extend to these claims is the subject of a pending third-party complaint filed in *Reinhart v. Nat'l Union Fire Ins. Co.*, No. 01-cv-3491 (JAP) (D. N.J. filed July 14, 2003).

fees award specifically. (*See* Pls.'s Response to Objections, Tabs 1, 3, 4, 5, 6, 10, 11, 12, 14,

18,19, & 24.)   Two objectors appeared in Court at the Fairness Hearing on December 12, 2003.

One of those two, Neal R. Monda, a Lucent employee and minor stockholder, is an ERISA Class

Member who appeared purposely to object to the proposed attorney's fees in this case.

(Transcript of Proceedings dated Dec. 12, 2003 at 40-46).

Though the small number of objections from the more than 136,000 member ERISA

Class, as a matter of law, favors the proposed fee, *see In re Cendant Corp. Deriv. Action Litig.*,

232 F. Supp. 2d at 338 (noting that an extremely small number of complaints regarding the

proposed fees supports approval of the requested fees), this conclusion should not be interpreted

as diminishing the vigorous objections articulated by Lucent current and/or former employees.

The Court observes, too, that of the Lucent-related litigations that participated in the Global

Settlement and that are subject to this Court's jurisdiction, this ERISA action has generated the

most objections to any fees proposal overall.  Lastly, the Court notes that Lucent itself objects to

the fees award sought here.  Thus, while consideration of this factor lends support for the fees

request, the Court concludes that the circumstances surrounding the objections somewhat weaken

that support.

### (3) *Gunter* Factor - Skill and Efficiency of Counsel

In examining the "skill and efficiency of the attorneys involved," *Gunter,* 223 F.3d at 195

n.1;  *id.* at 198, the Court considers that each of the attorneys who have participated as ERISA

Counsel is highly skilled, particularly in the area of complex ERISA litigations.  These attorneys,

Todd S. Collins of Berger & Montague, PC, Lynn L. Sarko of Keller Rohrback LLP, Edwin J.

Mills of Stull, Stull & Brody, and E. Graham Robb of Weber Gallagher Simpson Stapleton Fires

& Newby LLP, respectively, have submitted declarations relevant to their services in this case. Appended to those declarations are impressive firm resumes, lists of prominent class action cases successfully handled by the respective firms, and even a compilation of favorable judicial remarks regarding the services performed by Berger & Montague Attorneys. (*See generally* App. of Decls. in Support of Pls.'s Counsel's Mot. for an Award of Reasonable Attys.'s Fees & Reimbursement of Expenses ("ERISA Decls.").)   The Court has no difficulty concluding that the attorneys for the ERISA Class are highly qualified professionals who well represented their clients.

Recognizing that, however, the Court finds that the result achieved is largely attributable to factors wholly unrelated to the skill or qualifications of ERISA Counsel.  *Cf. Cullen*, 197 F.R.D. at 149 (explaining that "the results obtained" for a class evidence the skill and quality of counsel).  As previously explained, the settlement sum reflects the amount of money that Lucent allocated to the case based on its fiduciary insurance coverage. *See supra* Discussion **Gunter Factor - Complexity and Duration of Litigation, ERISA Counsel.**  Again, though the Court does not question ERISA Counsel's experience or capabilities, the Court still concludes that the particular settlement reached is not the result of ERISA Counsel's negotiating abilities. Overall then, this factor does not lend support to the fees request.

### (4) Size of Fund and Number of Persons Benefitted

The size of the fund and the number of persons who benefit from it, *Gunter*, 223 F.3d at 195 n.1, is also a relevant factor.  The Court is generally mindful that as the settlement fund increases, the percentage award decreases. *See In re Prudential Ins. Co. of Am. Sales Practices* ("*Prudential II*"), 148 F.3d 283, 339 (3d Cir. 1998) (explaining that the "basis for this inverse

relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.")(citations omitted); *see also Cullen,* 197 F.R.D. 136, 148 (E.D. Pa. 2000). The fund created is $69 million payable in stock or cash. (See Agreement Re: Global Settlement of Lucent Litigs., Ex. 4, Stip. & Agreement of Settlement, "The Settlement Consideration.")  Though ERISA Counsel represents it is the largest recovery involving ERISA claims of this type ever achieved, and the Court has no basis to dispute that, they concede as well that this is "novel litigation" (Transcript of Proceedings dated Dec. 12, 2003 at 115) lacking the benefit of a single precedent "mirror[][ing] the factual scenario set out by the pleadings in this case," (Pls.'s Counsel's Br. in Support of their Mot. For an Award of Reasonable Attys's Fees & Reimbursement of Expenses ("ERISA Class Br.") at 13.)

      The settlement also includes therapeutic relief in the form of changes to the Plans, a result that ERISA Counsel, through their expert, Professor Krishna Ramaswamy, claim adds considerable value for those Class Members who are LTSSP participants.  For example, Lucent no longer requires Company matching contributions to be made in the Lucent Stock Fund.  For a period of at least three years, the Company matching funds provided to LTSSP participants will be made in the same proportion as each participant's personal contributions, a change from Lucent's pre-litigation practices.  Additionally, Lucent has agreed to provide Plan Participants with the opportunity to move any investment existing in the Company match account (i.e., Company match contributions invested in Lucent stock) to any other funds available under the LTSSP.  In other words, Lucent has agreed to "unlock" the Company match, thus removing a restriction that precluded LTSSP participants from protecting their investments by diversification. *See Ikon*, 209 F.R.D. at 98-99 (discussing scholarly literature on the "unlock"

41

issue and the value of "unlock").  According to ERISA Counsel, "considering the unlock, the total value of the settlement, even ignoring the other structural changes to the plan, is probably close to $100 million."[14] (ERISA Class Br. at 16.)   Additionally, ERISA Plaintiffs's Counsel notes that additional provisions within the settlement compel Lucent to improve dissemination of information and education to Plan participants, all of which purport to be substantial benefits to such participants. (*See* Stip. & Agreement of Settlement dated Sept. 22, 2003 ¶¶ 37-39.)

The ERISA Class is comprised of approximately 136,000 current Lucent employees or Lucent retirees who are receiving other forms of health care, pension, or other retirement benefits from Lucent or will receive such benefits in the future.  Even if a plan participant did not make any investments in the Lucent Stock Fund (i.e., he or she had no purchases) during the Class Period, that individual is entitled still to compensation under the settlement because participants who **held** investments in the Fund during the Class Period may recover. (ERISA Class Br. at 18.)

The Court finds that the settlement for the ERISA Class well compensates a relatively large size class for their injuries.  This factor thus favors the proposed fees award.

### (5) *Gunter* Factor - Risk of Nonpayment

This case raises the same, serious risk of nonpayment that existed in the Common Stockholders Class Action as well as in all of the other Lucent-related litigations.  *See supra* II. Discussion D.1.A.(5) *Gunter* **Factor - Risk of Nonpayment**.

### (6) *Gunter* Factor - Amount of Time that Counsel Devoted to Case

The amount of time that ERISA Counsel has devoted to the case, *see Gunter,* 223 F.3d at

---

[14]  In seeking a fee under the percentage of recovery method, ERISA Counsel does not use $100 million as the total recovery figure.  (*See* ERISA Class Br. at 25 (focusing on the $69 million, without regard for the value of the plan therapeutics).)

195 n. 1, supports their request.  The declarations filed in support of ERISA Counsel's fees

request reveal that the four firms representing the ERISA Class have collectively devoted over

13,000 hours to this litigation.  (*See generally* ERISA Decls.)  In their brief, they contend that

they accumulated these hours by performing various services including: (i) communicating

extensively and continually with Class Members regarding both the merits of the case and

expectations regarding settlement; (ii) responding to discovery served on Lead Plaintiffs pre- and

post-deposition; (iii) analyzing insolvency or bankruptcy issues pertaining to Lucent; (iv)

participating at various hearings, mediation proceedings, and settlement conferences; (v)

reviewing 2.6 million pages of discovery produced by Lucent and meeting with financial and

economic experts; (vi) preparing court filings; and (vii) participating in the negotiations

regarding settlement and drafting documents related to settlement.  (ERISA Class Br. at 9-11 (a)-

(i).)

Lucent takes issue with ERISA Counsel's representation that they reviewed 2.6 million

pages of discovery produced by Lucent.  According to Lucent, those documents are solely

relevant to the Common Shareholders Class Action and were disclosed to the ERISA attorneys as

a courtesy.  In fact, Lucent only produced 31,000 pages of ERISA-specific documents.

Additionally, Lucent points out that only two depositions were taken, both lasted for one day a

piece, and both related only to the class certification issue.  (Transcript of Proceedings dated Dec.

2, 2003 at 116-17.)   Regardless of whether the Court agrees with Lucent, the Court concludes

that ERISA Counsel nonetheless dedicated significant time to the case.  Therefore, this factor

supports the fees proposal.

### (7) *Gunter* Factor - Awards in Similar Cases

To evaluate the request for a 20% fee, the Court must consider awards in similar cases. *Gunter,* 223 F.3d at 195 n.1.  In doing so, the Court is mindful that ERISA Counsel admits that minimal precedent for comparison exists because this case involves novel issues regarding ERISA litigation. (Transcript of Proceedings dated Dec. 12, 2003 at 112-13.)  Absent favorable precedent, ERISA Counsel points to this Court's decision in *In re AremisSoft Corp. Securities Litigation,* 210 F.R.D. 109 (D.N.J. 2002) as support for the proposition that "courts in this district frequently award fees of 33 percent or more in common fund case[s]."(ERISA Class Br. at 27.)  While this is an accurate statement, *id.* at 133 (citations omitted); *see generally* Discussion *supra* D.1.A.(7) **Gunter Factor - Awards in Similar Cases** (listing more than twenty relatively recent class action decisions in the Third Circuit that reflect fee awards between 331/3% and 22.5%), this Court noted also in *AremisSoft* that the Third Circuit directs district courts not to "rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *AremisSoft,* 210 F.R.D. at 133 (citing *In re Cendant PRIDES Litig.*, 243 F.3d at 736); *see also In re Rent-Way Sec. Litig.,* 305 F. Supp. 2d at 514 (citation omitted).  In fact, this is because the range of attorney's fees considerably varies. *In re Cendant PRIDES Litig.*, 243 F.3d at 736.

In reviewing class action fee awards granted inside and outside of this Circuit, this Court well recognizes that awards range as high and even higher than the 20% recovery sought here. *See supra* Discussion **(7) Gunter Factor - Awards in Similar Cases -Common Shareholders.** Irrespective of this, however, the Court "consider[s] the relevant circumstances," *AremisSoft,* 210 F.R.D. at 133, and concludes that a slightly reduced fee of 15% or $10,350,000 sufficiently compensates ERISA Counsel for their services.  This award accounts for what the Court

perceives to be the foregone conclusion that the fiduciary insurance policy limits dictated the settlement amount.  As candidly observed by at least one of the attorneys for the ERISA Class, ERISA Counsel was obliged to its client to accept no less than the policy limits in settling this matter.  Again, while the Court cannot overstate its respect for the capabilities of ERISA Counsel throughout this litigation, the Court determines nevertheless that the recovery for the ERISA Class was a virtual certainty here once Lucent specifically allocated $69 million to the Gross Settlement for this ERISA litigation.

Furthermore, the Court would be remiss if it did not note that the award for ERISA Counsel is particularly sensible given that Common Shareholders Lead Counsel has received an award of only 2% more.  No one who has participated in any part of the Global Settlement process can reasonably dispute that Common Shareholders Lead Counsel served as the lead in that process and performed extraordinarily in that capacity. For these reasons, the Court awards ERISA Counsel a 15% fee award totaling $10,350,000.

### B. Application of the Lodestar Recovery Method

Though the Court is satisfied that its fees calculation is appropriate, it will cross-check its result under the percentage-of-recovery method by applying the lodestar method. The attorneys who have served as ERISA Counsel have devoted 13,632.62 hours in handling this action.  The Court multiplies the number of hours devoted to the case by the average rates of the most senior lawyers from each of the Lead Counsel firms to arrive at a lodestar fee of $ 4,202,648.70. *See supra* n.11.  Thus, the Court's calculation represents a 2.46 multiplier.  Because this multiple falls between one and four, *see Prudential II*, 148 F.3d at 341 (citations omitted), the Court concludes that the award calculated is appropriate under the lodestar cross-check.

45

In sum, the Court determines that the fees award here reflects a careful consideration of the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the lodestar methodology.  The Court's decision reflects as well its consideration of the objections to the fees award in this case and the Plaintiffs's response to those objections.

### C.  Reimbursement of Expenses and Compensation Requests for Lead Plaintiffs

ERISA Counsel also seeks $550,512.57 as reimbursement for expenses and costs incurred in handling this litigation.  Given that their summary of litigation expenses indicates that the expenses are adequately documented, reasonable, and appropriate for the litigation of this matter, *see Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995), the Court approves their reimbursement request.

Additionally, ERISA Counsel further requests compensatory awards of $5,000.00 for Lead Plaintiff Warren Reinhart and Gerald M. Smith, respectively, and $2,500.00 for later-added Plaintiff Larry Dane based on their "substantial service to the ERISA Class." (ERISA Br. at 34-35.)  ERISA Counsel requests that these awards be allocated from the ERISA Settlement Fund. In the Notice provided to all potential Class members, ERISA Counsel indicated its intent to move for compensation for Reinhart, Smith, and Dane.  No party has objected to this.  Given ERISA Counsel's recommendation for awards to the class representatives, the Court grants that request. *See, e.g.*, *In re Smithkline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535 (E.D. Pa. 1990).

In conclusion, the Court awards a fee award of 15% or $10,350,000.00  It also awards $550,512.57 as reimbursement for expenses and costs incurred in handling this litigation.  The Court also awards a sum of $5,000.00 to Class Representative Warren Reinhart, a sum of

$5,000.00 to Class Representative Gerald M. Smith, and a sum of $2,500.00 to Class Representative Larry Dane.

### 3. *Balaban v. Schacht*, 02-cv-4852 (JAP) - Lucent Note Holders Litigation

The firms of Kaufman Gelbert & Bern LLP and Wechsler Harwood LLP serve as counsel for Plaintiff and the Class ("Balaban Counsel"). Balaban Counsel seek an award of attorney's fees of 25% of the $4.6 million Settlement plus reimbursement for out-of-pocket expenses in the amount of $30,386.63.

### A. *Gunter* Analysis

#### (1) *Gunter Factor* - Complexity and Duration of Litigation

The complexity and duration of the litigation is significant to the Court's determination regarding the reasonableness of the fee request. *Gunter*, 223 F.3d at 195 n.1, 197. This action arose from common law causes of action based on Defendants's alleged breaches of fiduciary duties in disseminating to the public materially misleading statements concerning the status of Lucent's revenue and earnings. The Class is comprised of holders of the following Lucent securities at any time between April 13, 1999 and September 13, 2002 (the "Class Period"): (a) 7.7% Notes Due May 19, 2010; (b) 8% Notes Due May 18, 2015; (c) 8% Redeemable Convertible Preferred Stock; and (d) 7.75% Redeemable Convertible Preferred Stock (collectively the "Securities"). The theory that Defendants breached fiduciary duties under these circumstances reflected a relatively novel ground for liability on behalf of a holder class. Plaintiff also pleaded that these public statements were materially misleading and inaccurate because the Individual Defendants knew but concealed the fact that Lucent was suffering problems that materially undermined its reported financial health and ability to compete.

47

According to the Plaintiff, these misrepresentations and omissions improperly elevated the price of the Securities and ultimately caused the Class to suffer damages when Lucent's problems were revealed.

Though confident that the case was complex, the Court is not so bold in considering its duration. This action was filed on October 7, 2002, more than one year before the Fairness Hearing. Plaintiff had not yet engaged in intensive discovery and had not filed or prepared any motion papers when the parties began settlement negotiations. And, the only precedent for this novel lawsuit was discouraging. After Plaintiff filed this action, a Delaware court dismissed with prejudice a similar case on behalf of holders for breach of fiduciary duty because the claims "are derivative . . . ." *Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 WL 31926606, at * 5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003). With unfavorable precedent on a new issue, Plaintiff became interested in a settlement. Thus, while it is possible that the parties could have engaged in protracted litigation if the case had not settled, as Balaban Counsel argues, the Court finds it unlikely. This factor does not strongly support the requested fee.

### (2) *Gunter* Factor - Presence or Absence of Substantial Objections

The "presence or absence of substantial objections" is a relevant consideration. *Gunter,* 223 F.3d at 195 n.1. A lack of objections supports counsel's fees request. *See Gen. Motors*, 55 F. 3d at 812 (explaining that it is generally assumed that "'silence constitutes tacit consent to the agreement'") (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)); *Cullen*, 197 F.R.D. at 149 (finding that a lack of objections supported approval of fee request). Over $15,000 copies of the Notice of Pendency of Consolidated Class Action, Settlement and Hearing Thereon (the "Notice") were mailed to potential Class Members including both institutional and

48

individual investors. (*See* Aff. of Michael Rosenbaum of Berdon LLP, the Claims Administrator (the "Rosenbaum Aff.") ¶ 5.)  That notice advised of the $4.6 million settlement and Balaban Counsel's intent to seek an award up to a 33% fees award.  The notice expressly advised Class Members that they could object to the settlement or fee application.  Neither Balaban Counsel nor the Court has received any objections to either the settlement or the fees request.  This is significant not just because of the number of notices distributed, but also because the Class includes many large, sophisticated, institutional investors who collectively purchased a substantial percentage of the Securities during the Class Period. *See Gen. Motors*, 55 F.3d at 812. Only two investors have elected to opt-out, one of which is an institutional investor that has filed its own lawsuit.  This factor thus supports the request.

### (3) *Gunter* Factor - Skill and Efficiency of Counsel

Relevant to the "skill and efficiency of the attorneys involved," *Gunter,* 223 F.3d at 195 n.1;  *id.* at 198, the Court finds that the attorneys who have served as Balaban Counsel are highly skilled and practice extensively in the field of shareholder litigation. (*See* Aff. of Pl.'s Counsel.) They have prepared an affidavit detailing their background and experience.  The Court has no difficulty concluding that the attorneys here are highly qualified professionals who well represented their clients.  Additionally, as the Court noted earlier, because the quality and vigor of opposing counsel is also relevant in evaluating the quality of the services that Balaban Counsel provided, *see, e.g.*, *Ikon*, 194 F.R.D. at 194, the fact that defense counsel is a formidable adversary with an exceptional reputation nationwide bolsters the conclusion here.  Because Balaban Counsel provided high quality service to the Class, the Court determines that this factor supports the requested fee.

### (4) *Gunter* Factor - Size of Fund and Number of Persons Benefitted

The fund here is $4.6 million and benefits more than 15,000 investors. *See Gunter*, 223

F.3d at 195 n.1 (considering the size of the fund and number of persons benefitted).  Though a

relatively small sum, the $4.6 million cash settlement has enhanced value, as Plaintiff points out,

because the consideration does not include coupons, illiquid securities, or any other form of

consideration that may pose marketability doubts.  Additionally, the number of investors is large

and includes all injured Securities holders during the Class Period.  This factor supports the

proposed fee.

### (5) *Gunter* Factor - Risk of Nonpayment

The risk of nonpayment was no different here than it was in the other Lucent-related

litigations based on the Company's precarious financial condition.  *See supra* II. Discussion

D.1.A.(5)  Additionally, the Court notes that Balaban Counsel represented Plaintiff on a

contingent basis and, in doing so, assumed a substantial, real risk that it would not recover.

Though any counsel representing a client on a contingent basis encounters this risk, the Court

finds that the risk was more definite here because Plaintiff's legal theory was novel and thus

uncertain.  In fact, Plaintiff's desire to settle was prompted by an unfavorable decision in

Delaware dismissing with prejudice a case on behalf of holders for breach of fiduciary duty

because the claims "are derivative . . . ."  *Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 WL

31926606, at * 5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003).   For these reasons,

this factor supports the requested fee.

### (6) *Gunter* Factor - Amount of Time that Counsel Devoted to Case

The amount of time devoted to the case, *see Gunter,* 223 F.3d at 195 n. 1, totals over 520

hours.  (*See* Aff. of Robert I. Harwood ¶¶ 51-55.)  According to Balaban Counsel, these hours

were spent drafting and filing the complaint, researching opposition to anticipated defense

motions, reviewing documents, engaging in settlement negotiations, preparing a damages

analysis, and drafting settlement documents and the proposed Plan of Allocation. *Id.* ¶ 53.

While the Court does not doubt Balaban Counsel's commitment to this litigation and does not

question its work, the fact remains that the attorneys in this case used fewer hours of attorney

time than in comparable litigation.  This is evident merely from a comparison of this case to the

other Lucent-related litigations that participated in the Global Settlement.  Even Balaban Counsel

predicted that its representation might have required "thousands of hours of hard work, " *Id.* ¶ 58,

yet it did not.  Thus, this factor does not strongly support the Fee Petition.

### (7) *Gunter* Factor - Awards in Similar Cases

District courts should consider fees awarded under the percentage-of-recovery method in

other class action litigations and should review awards in similarly sized cases.  *Cendant*

*PRIDES*, 243 F.3d at 736-37.   While the Court recognizes generally that this relatively small,

$4.6 million common fund falls into a category in which fee awards can range considerably high,

*see Erie County Retirees Ass'n*, 192 F. Supp. 2d at 381 (considering that [f]ee awards ranging

from thirty to forty-three percent have been awarded in cases with funds ranging from $400,000

to $6.5 million, funds which are comparatively smaller than many.") (citing *Lazy Oil Co. v.*

*Witco Corp.*, 95 F. Supp. 2d 290, 342 (W.D. Pa. 1997)), the Court is not bound to any set

percentage and must rule based on the circumstances of this case.  *See Safety Components*, 166 F.

Supp. 2d at 101 (observing that courts should not rely on a formulaic approach in setting a fee,

but instead "must consider the relevant circumstances of the particular case.") (citation omitted).

In assessing the circumstances, then, the Court finds the proposed fee unreasonable for three principal reasons.  First, Plaintiff concedes that it sought a settlement only after a Delaware Court dismissed with prejudice *Manzo*, a similar action brought on behalf of holders for breach of fiduciary duty, and held that the holders's claims were derivative in nature.  Because of the unfavorable precedent, the parties were willing to settle at a relatively early stage of their case.  Second, while the Court, again, does not challenge Balaban Counsel's level of dedication to this case, the Court nevertheless finds that the amount of hours worked in this case pales in comparison to the hours expended in most class action litigations, particularly the other litigations that participated in the Global Settlement here.  Third, the fee award for Balaban Counsel should be commensurate with the awards in the other litigations that are the subject of this Opinion.  For these reasons,  the Court concludes that the fees award should be slightly reduced from 25% to 20%, for a total award of $920,000.

### B. Application of the Lodestar Recovery Method

The Court cross-checks its result under the percentage-of-recovery method by applying the lodestar method.  The attorneys who have served as Balaban Counsel have devoted 520.5 hours to this action.  The Court multiplies the number of hours worked in the case by the average rates of the most senior lawyers from each of the Lead Counsel firms to arrive at a lodestar of $286,275. *See supra* n.11.  Thus, the Court's calculation represents a 3.21 multiplier.   Since "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," *Krell v. Prudential*, 148 F.3d at 341 (citations omitted), the Court finds that the award calculated is appropriate under the lodestar cross-check.

 In sum, the Court determines that the fees award here reflects a careful consideration of

all the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the lodestar methodology.

### C.  Reimbursement of Expenses and Compensation Requests

Counsel also seeks $30,386.63 as reimbursement for expenses and costs incurred in handling this litigation.  Their summary of litigation expenses indicates that the expenses are adequately documented, reasonable, and appropriate for the litigation of this matter, *see Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995), and thus the Court approves their reimbursement request.

In conclusion, the Court awards a fee award of 20% or $920,000.  It also awards $30,386.63 as reimbursement for expenses and costs incurred in handling this litigation.

### 4.  *Laufer v. Lucent Technologies, Inc.*, 01-cv-5229 (JAP) - Debt Securities Holders

The firms of Squitieri & Fearon LLP, Kirby McInerney & Squire LLP, and The Wexler Firm serve as Co-Lead Counsel ("Laufer Counsel") in this case for the Lead Plaintiffs.  Lead Plaintiffs Arthur Laufer and Joseph Schneider are representatives of a class of purchasers of the following Lucent Technologies, Inc., debt securities: (i) 6.9% Notes due July 15, 2001; (ii) 7.25% Notes due July 15, 2006; (iii) 6/5% Debentures due January 15, 2008; (iv) 5.5% Notes due November 15, 2028; and (v) 6.45% Debentures due March 15, 2029 (the "Debt Securities") who purchased any of the Debt Securities during the period from December 20, 2000 through March 27, 2001 (the "Class Period").[15]  Laufer Counsel seek a fee of 25% of the $3.75 million

---

[15]  Excluded from the Class are Defendants Lucent, Henry Schacht and Deborah Hopkins, the affiliates and subsidiaries of Lucent, the officers and directors of Lucent and its affiliates and subsidiaries at all relevant times, members of the immediate families (parents, spouses, siblings, and children) of any Defendants, the legal representatives, heirs, successors or assigns of any excluded person, and any entity in which any excluded person has or had a controlling interest.

settlement, $937,500, and reimbursement of $84,359.95 for out-of-pocket expenses.  Counsel

and Laufer agreed to a 25% fee for legal representation. Co-Lead Counsel also seeks an award of

fees of notice and administration for The Garden City Group in the amount of $50,620.43 for

services through October 31, 2003.  The total sought is $1,072,480.38.

## A. *Gunter* Analysis

### (1) *Gunter Factor* - **Complexity and Duration of Litigation**

The complexity and duration of the litigation support the proposed fee. *See Gunter*, 223

F.3d at 195 n.1, 197.  Plaintiffs faced substantial risks in successfully pleading and proving

liability for the alleged misstatements and omissions contained in Lucent's SEC filings and

public statements.  Defendants vigorously opposed Plaintiffs's claims, contending that they were

not viable unless Plaintiffs could prove that Defendants had a duty to disclose the true state of

Lucent's and Agere's finances to the investing public.  Defendants also argued that any alleged

misstatements amounted to nothing more than "puffery."  While Plaintiffs believe they would

have been successful, they concede, as they must, that their case might not have survived a

motion to dismiss, an inevitable motion for summary judgment, and ultimately a trial.

Defendants also challenged the sufficiency of the complaint on the basis that Plaintiffs

had failed to adequately allege scienter.  Specifically, Defendants claimed that Plaintiffs alleged

no more than "commonplace" motivations applicable to any executive or company and,

therefore, could not meet the PSLRA stringent pleading standards for scienter.  Plaintiffs, in

response, argued that Defendants were motivated to conceal Lucent's and Agere's true financial

condition.  According to Plaintiffs, Lucent's viability as a company depended upon the success of

the IPO, and Defendants's failure to complete the IPO would deprive Lucent of billions of dollars

necessary for the Company's survival.  Plaintiffs contended that truthful disclosures would have effectively jeopardized essential debt restructuring and would have led almost certainly to Lucent's bankruptcy.  Defendants further claimed that the complaint failed to allege actual knowledge or conscious disregard of Lucent's true financial condition.  Again, Plaintiffs were uncertain whether they would have prevailed on a motion to dismiss.

Finally, with respect to damages, Defendants could have argued either that there was no loss causation between the federal securities laws violations and the trading price of Lucent Debt Securities or, if there were, that the effect was minimal. (Decl. of Olimpio Lee Squitieri in Support of Approval of Settlement & Pet. for Fees & Expenses ("Squitieri Decl.") ¶ 46(a)-(b).) Plaintiffs admit that, depending upon whether the Court credited their damages and market expert opinions on causation, this issue could have gone either way.  Hopeful that expert assistance would cause them to prevail, Plaintiffs recognize nevertheless that the outcome on the loss causation issue, among other issues, was unpredictable.

These vigorously disputed contentions created a very challenging litigation for Plaintiffs and the Class.  Moreover, this case was pending for more than two years before any settlement discussions began.  The parties agreed to settle after two years of active litigation preparation including researching and drafting the complaint, briefing the motion to dismiss, researching and drafting the motion for class certification, and analyzing and actively participating in more than six months of arm's-length settlement negotiations.  The Court notes as well that Olimpio L. Squitieri, Esq., the main lawyer from the Squitieri firm litigating this case, was actively involved on the Ability to Pay Committee and made efforts critical to executing the settlement.  Without a settlement, discovery, pre-trial, and trial proceedings could have delayed any resolution another

year or two, and the parties would have to litigate without any assurance that Lucent would remain a going concern.   This factor thus supports the proposed fee.

### (2) *Gunter* Factor - Presence or Absence of Substantial Objections

The absence of substantial objections here supports the request. *See Gunter,* 223 F.3d at 195 n.1; *see Gen. Motors*, 55 F. 3d at 812 (explaining that it is generally assumed that "'silence constitutes tacit consent to the agreement'") (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)); *Cullen*, 197 F.R.D. at 149 (finding that a lack of objections supported approval of fee request). There were 10,050 copies of the Notice of Pendency of Class Action, Class Action Determination, Hearing on Proposed Settlement and Attorney's Fee Petition, Right to Appear and Right to Share in Settlement Fund mailed to Class Members. (*See* Aff. of Brian Burke re: Mailing of Notice of Proposed Settlement of Class Litig. & Settlement Hearing dated Nov. 11, 2003 (Annexed to the Squitieri Decl. as Ex. A) ("Burke Aff.") ¶ 7.))  The Notice described the $3.75 million recovery and the anticipated petition for attorney's fees of up to 25% of the settlement fund and for reimbursement of expenses up to $150,000.00. (*Id.* at Ex. A.) Although the notice advised Class Members that they could object to the petition for attorney's fees and reimbursement of expenses, no one has objected to the fee and expense request. (Squitieri Decl. ¶ 5.)  The reaction of the Class has been positive, and thus this factor supports the fees request.

### (3) *Gunter* Factor - Skill and Efficiency of Counsel

In considering the "skill and efficiency of the attorneys involved," *Gunter,* 223 F.3d at 195 n.1;  *id.* at 198, the Court finds that the law firms representing Plaintiffs are highly skilled, experienced litigators in the field of securities law.   These firms have successfully prosecuted

numerous federal securities class actions yielding substantial recoveries for their clients, and the

attorneys possess collectively decades of experience, specialization, and success in litigating

securities class actions. (Squitieri Decl. ¶ 58.)  Laufer Counsel worked quickly and efficiently to

prepare the claim against Lucent, to amend the complaint, to mount a defense against Lucent's

motion to dismiss, to research and prepare a motion for class certification, and to reach the

settlement negotiated here.  In negotiating its allocated sum from the Global Settlement Fund,

Plaintiffs also dealt with the formidable forces of counsel involved in the other Lucent-related

litigations that participated in the Global Settlement.  Additionally, as the Court noted earlier,

because the quality and vigor of opposing counsel is also relevant in evaluating the quality of the

legal services, s*ee, e.g.*, *Ikon*, 194 F.R.D. at 194, defense counsel's solid reputation underscores

the high caliber service provided to the Class.  This factor thus supports the requested fee.

### (4) *Gunter* Factor - Size of Fund and Number of Persons Benefitted

The fund here is $3.75 million and is estimated to benefit more than 10,000 investors. *See*

*Gunter*, 223 F.3d at 195 n.1 (considering the size of the fund and number of persons benefitted).

(Squitieri Decl. ¶ 5.)  The fund is also significant relative to the potential recovery.  Lucent Debt

Securities were affected in different amounts as the truth concerning Lucent's accounts

receivable portfolio, debt rating, and the sell-though of the Agere IPO was revealed.  Throughout

the action, Laufer Counsel consulted with their damages expert to ascertain the global value of

the action.  As a result of the settlement, Plaintiffs's experts estimate that the Class suffered harm

in the range of $16-$21 million.  (Squitieri Decl. ¶ 37.) Thus, the settlement offers Class

Members approximately 20-25% of the Class-wide damages.  (Squitieri Decl. ¶ 37.)  This factor

supports the Fee Petition.

**(5) *Gunter* Factor - Risk of Nonpayment**

The risk of nonpayment is no different in this case than in the other Lucent-related

litigations that are the subject of this Opinion. *See supra* II. Discussion D.1.A.(5).  Though

Laufer Counsel sought additional funding for their claims, they determined ultimately that no

such sources were available. (Squitieri Decl. ¶¶ 30-33.)   Additionally, the Court notes that

Laufer Counsel accepted this case on a contingent basis and, in doing so, assumed a substantial,

real risk that it would not recover.  For these reasons, this factor supports the requested fee.

**(6) *Gunter* Factor - Amount of Time that Counsel Devoted to Case**

The amount of time devoted to the case, *see Gunter,* 223 F.3d at 195 n. 1, totals 1,477

hours. (Squitieri Decl. ¶ 51.)  Olimpio Squitieri, Esq. is the main lawyer from the Squitieri firm

litigating this case, and his firm performed the vast majority of work in this case. (Squitieri Decl.

¶ 3.)   Squitieri has submitted a detailed Declaration outlining his efforts throughout the case and

has also submitted a chart summarizing the firm's hours and work.  (Decl. of Olimpio Lee

Squitieri Including Lodestar & Expense Report ¶¶ 3-4 & Ex. A; *see generally* Squitieri Decl.)

The other firms, Kirby McInerney & Squire and The Wexler Firm, have also submitted

Declarations that reflect the number of hours devoted to the case.  (See Decl. of Ira M. Press

Including Lodestar & Expense Report & Decl. of Edward A. Wallace in Support of App. of Fees

& Expenses.)  Given the efforts taken at the pleading stage, at the motion stage, and throughout

the Global Settlement negotiations, the amount of time spent attests to counsel's efforts.  This

factor supports the request.

**(7) *Gunter* Factor - Awards in Similar Cases**

In evaluating Counsel's request for 25%, the Court must consider awards in similar cases.

*Gunter*, 223 F.3d at 195 n.1, ever mindful that the Court need not apply a set percentage and must determine a percentage based on the circumstances of this case.  *See Safety Components*, 166 F. Supp. 2d at 101 (observing that courts should not rely on a formulaic approach in setting a fee, but instead "must consider the relevant circumstances of the particular case.") (citation omitted). Given a review of similar cases in this Circuit as well as the overall circumstances of this case, this Court concludes that Laufer Counsel's request is reasonable.  The 25% fee requested is well within the range of percentages awarded in similar securities class action settlements within this Circuit.  *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603 (E.D. Pa. 2003) (awarding fees of $31.66 million, 25% of settlement fund); *In re ATI Techs., Inc., Sec. Litig.*, No. 01-2541, 2003 WL 1962400, at *2 (E.D. Pa. April 28, 2003) (30% of $8 million settlement fund); *AremisSoft*, 210 F.R.D. 109 (attorney fee application seeking 28% of gross class recovery was reasonable); *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423 (E.D. Pa. 2001) (one-third of $48 million settlement fund); *In re Aetna, Inc. Sec. Litig.*, 2001 WL 20928, at *14 (30% for total fees of $24.3 million). Moreover, on balance, the other *Gunter* factors clearly favor the request as reasonable.  A lesser fee would not adequately compensate Laufer Counsel for their substantial work in this case.  Assuming arguendo that the Court were inclined to reduce the fee, for example, to 17%, the same percentage awarded to Common Shareholders Lead Counsel, the fee would total $637,500 - a sum that is less than the lodestar in this case and represents a less than one multiplier. *See infra* **B. Application of the Lodestar Recovery Method**.  Finding that the fee requested is entirely reasonable, this Court concludes that Counsel shall be awarded a 25% fee or $937,500.

**B. Application of the Lodestar Recovery Method**

The Court cross-checks its result under the percentage-of-recovery method by applying the lodestar method.  Plaintiffs filed an application for attorney's fees in the amount of $604,526.25 for their counsel, Squitieri & Fearon, LLP, based on 1,245.50 hours and an hourly fee range of $275-490 per hour; attorney's fees in the amount of $61,205.00 for their counsel, Kirby McInerney & Squire, LLP, based on 169.75 hours and an hourly fee range of $395-575 per hour; attorney's fees in the amount of $22,931.55 for their counsel, The Wexler Firm, based on 62.2 hours and an hourly fee range of $275-$525 per hour. (Squitieri Decl. ¶ 51.)  The aggregate lodestar of Plaintiffs's Counsel is $688,662.80 ($604,526.25 + $61,205 + $22,931.55).  (Squitieri Decl. ¶ 51.)  Thus, the Court's calculation represents a 1.36 multiplier.   Since "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," *Krell v. Prudential*, 148 F.3d at 341 (citations omitted), the Court decides that the award calculated is appropriate under the lodestar cross-check.

In sum, the Court determines that the fees award here reflects a careful consideration of all the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the lodestar methodology.

**C.  Reimbursement of Expenses and Compensation Requests for Lead Plaintiffs**

Laufer Counsel also seek reimbursement of $84,359.95 in out-of-pocket litigation costs and expenses, which includes $65,637.00 in expert fees, and an additional $50,620.43 for costs of notice and administration for The Garden City Group through October 31, 2003. (Squitieri Decl. ¶ 53.) Counsel has prepared individual firm fee affidavits that summarize the expenses. Given that their summary of litigation expenses indicates that the expenses are adequately documented, reasonable, and appropriate for the litigation of this matter, *see Abrams v.*

*Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995), and that no member of the Class has raised

any objection to the request, Squitieri Decl. ¶¶ 4, 5, the Court approves their reimbursement

request.

In conclusion, the Court awards a fee award of 25% or $ 937,500.  It also awards a total of

$134,980.38 as reimbursement for expenses and costs incurred in handling this litigation and for

notice-related costs.

### 5.  *Pallas v. Schacht*, *et. al.*, 02-2460 (JAP) - The Derivative Plaintiffs

Several law firms represent Plaintiffs in this derivative shareholder action.   Co-Lead

Derivative Counsel is Greenfield & Goodman, LLC and Schiffrin & Barroway, LLP.   Liaison

Counsel is Trujillo Rodriguez & Richards LLC.  Two additional law firms, Donovan Searles,

LLC and Weinstein Kitchenoff Scarlato & Goldman Ltd., serve as "Other Derivative Counsel."

Collectively, the Court refers to all of these firms as "Derivative Counsel."  Derivative Counsel

request a $3.5 million fee, or 25% of the $14 million paid to Lucent, to be included in the Global

Settlement Fund.[16]  Derivative Counsel justify this fee based on typical awards in complex

shareholder litigation and on the therapeutic relief achieved through this action.  According to

Derivative Counsel, the therapeutic relief takes the form of corporate governance changes, and

they are:

> (1) Lucent's Corporate Governance and Compensation Committee
> Charter shall be revised to provide that this Committee will have the

---

[16]  Derivative Counsel suggest in their brief that the parties have agreed to a $3.5 million
fee. (Deriv. Pls.'s Mem. of Law in Support of Final Approval of Deriv. Settlement & The Award
of Atty's Fees & Expenses to Deriv. Counsel at 25-27).  But this is inaccurate.  As Counsel for
Lucent clarified during the Fairness Hearing, the parties agreed in the Stipulation of Settlement
that Lead Counsel would move for an award of fees and expenses not to exceed $3.5 million.
(Transcript of Proceedings dated Dec. 12, 2003 at 101-02.)

authority, on its own initiative, to retain such advisors and consultants
as the Committee deems advisable, and to set the compensation of
such advisors and consultants.

(2) Lucent's Audit Committee Charter of the Audit and Finance Committee
of the Board of Directors shall be revised to provide that this Committee
will have the sole authority to hire, fire, and set the compensation
and other terms of retention of Lucent's independent auditor.

(Deriv. Pls.'s Mem. of Law in Support of Final Approval of Deriv. Settlement & the Award of

Attys's Fees & Expenses to Deriv. Counsel at 7).  While Defendants do not dispute that these

changes have been accomplished, they contend that these changes are due to circumstances

unrelated to this derivative litigation.

## A.  *Gunter* Analysis

### (1) *Gunter Factor* - Complexity and Duration of Litigation

The complexity and duration of the litigation must be considered. *See Gunter*, 223 F.3d at

195 n.1, 197.  Allegations that Lucent Board of Directors breached their fiduciary duties under

Delaware common law by failing properly to oversee and manage Lucent's business and

operations gave rise to this derivative lawsuit.  The shareholders alleged, among other things, that

Lucent engaged in improper accounting and revenue recognition practices during fiscal years

1999 and 2000, causing the Company's published financial results to be materially misleading.

Beginning in January 2001, eight shareholder derivative actions were filed in the Court of

Chancery, New Castle County, Delaware.  All but one of those actions were consolidated.  On

March 4, 2003, a substantially similar action was filed in the same Delaware Court. That action

was deemed consolidated with and part of the other Delaware actions.[17]  On February 14, 2001,

Plaintiff George Pallas made a written demand on Lucent's Board of Directors to commence an

action against several former Lucent executives including, among others, Richard A. McGinn

and Deborah C. Hopkins.  On May 22, 2002, Pallas filed this shareholder's derivative action,

*Pallas v. Schacht*, No. 02-2460.  Several months later, Pallas's counsel filed another

shareholder's derivative action on behalf of Plaintiff Eva Cooper, *Cooper v. Schacht*, No. 02-

4260. Ultimately, the parties in the *Pallas* and *Cooper* suits and the Delaware actions agreed to

coordinate their litigation efforts going forward.   As a result, this litigation has been prosecuted

in multiple fora, has involved multiple firms, and has spanned more than three years.   It has been

coordinated with parallel state court cases and also related class actions and individual cases

asserting claims for securities fraud, common law fraud, ERISA violations, breaches of contract,

debt covenant violations, and other related claims.

      The Court does not dispute the complexity of this matter or its background.  The Court

must observe, however, that Derivative Counsel's position is undermined by the fact that they

credit certain results to their own efforts when, in fact, they stem from events unrelated to the

derivative litigation.  According to Derivative Counsel, their litigation produced these significant

corporate governance changes:

> (1) Lucent's Corporate Governance and Compensation Committee
> Charter shall be revised to provide that this Committee will have the
> authority, on its own initiative, to retain such advisors and consultants
> as the Committee deems advisable, and to set the compensation of
> such advisors and consultants.

---

[17]  On or about April 5, 2002, one of the cases was voluntarily dismissed without
prejudice.

>(2) Lucent's Audit Committee Charter of the Audit and Finance Committee
>of the Board of Directors shall be revised to provide that this Committee
>will have the sole authority to hire, fire, and set the compensation
>and other terms of retention of Lucent's independent auditor.

These revisions have been made as a result of other circumstances.   In particular, as a result of a Securities and Exchange Commission ("SEC") investigation into Lucent, Lucent entered into a consent decree by which it agreed to effectuate various corporate governance changes. Additionally, by statute, the committees of the Board of Directors are granted authority to engage independent counsel and other advisors. *See* 15 U.S.C. § 78j-1(m)(2) ("The audit committee of each issuer, in its capacity as a committee of the board of directors, shall be directly responsible for the appointment, compensation, and oversight of the work of any registered public accounting firm employed by that issuer (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work, and each such registered public accounting firm shall report directly to the audit committee.") Thus, Lucent's Audit and Compensation Committees were responsible, as a matter of law, to retain their own consultants and advisors. *See also* 15 U.S.C. § 7213(a)(4) (providing that "The Board shall convene, or authorize its staff to convene, such expert advisory groups as may be appropriate, which may include practicing accountants and other experts, as well as representatives of other interested groups, subject to such rules as the Board may prescribe to prevent conflicts of interest, to make recommendations concerning the content (including proposed drafts) of auditing, quality control, ethics, independence, or other standards required to be established under this section.") Therefore, because Derivative Counsel's "results" are essentially not of their own doing, this factor does not well support the fee request.

### (2) *Gunter* Factor - Presence or Absence of Substantial Objections

A lack of substantial objections favors a fee request. *See Gunter,* 223 F.3d at 195 n.1; *see Gen. Motors*, 55 F. 3d at 812 (explaining that it is generally assumed that "'silence constitutes tacit consent to the agreement'") (quoting *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)); *Cullen*, 197 F.R.D. at 149 (finding that a lack of objections supported approval of fee request). As directed by Court order, Derivative Counsel made efforts to publish notice of the proposed settlement and fee petition in *The Wall Street Journal* and the *New York Times*.   Notice was also published on the PR Newswire and on the Internet.  Individual mailed notices to Lucent shareholders also referenced this derivative settlement.  After summary notices of the settlement appeared on Lucent's website, thousands of additional notices of the settlement and fees request were e-mailed or mailed to those persons requesting such information.  Substantively, the published advised shareholders of their right to object to the proposed settlement including the request for attorney's fees and litigation expenses totaling up to $3.5 million.  To date, the Court has received no objections relevant to this derivative case.  (Certif. of Lisa J. Rodriguez, Esq. in Support of Deriv. Settlement & The Pet. for Atty's Fees & Reimbursement of Expenses ("Rodriguez Certif.") ¶ 3.)   For this reason, this factor supports the fee request.

### (3) *Gunter* Factor - Skill and Efficiency of Counsel

In examining the "skill and efficiency of the attorneys involved," *Gunter,* 223 F.3d at 195 n.1;  *id.* at 198, the Court finds that the law firms representing the Derivative Plaintiffs are well-qualified, experienced litigators in derivative actions and litigation generally.  Derivative Counsel has provided firm biographies that explain their national reputations as shareholder advocates and demonstrate their years of experience litigating derivative claims. (*See* Rodriguez Certif., Ex.

C.)  The Court concludes that their work was valuable and that Derivative Counsel well represented their clients in their action and in the settlement negotiations.

### (4) *Gunter* Factor - Size of Fund and Number of Persons Benefitted

The fund is $14 million, *see Gunter*, 223 F.3d at 195 n.1 (considering the size of the fund and number of persons benefitted), to be paid to Lucent from Lucent's directors and officers liability insurance insurers (the "D& O Insurers"). (Agreement Re: Global Settlement of Lucent Litigations at 12-13 ¶ (c) Insurance Cash & at 16 ¶ 5.)  The D&O Insurers had agreed already to pay $148 million to fund the Global Settlement. (*Id.* at 12 ¶ (c).)  A small portion of that sum, the $14 million was earmarked as a settlement for this derivative case only after Lucent agreed to use this net payment, minus fees and expenses, to partially fund the Global Settlement.  According to Derivative Counsel, however, their settlement negotiations swayed the Defendants to use these net monies for the Global Settlement.

Considering the circumstances, the Court finds that this factor does not support the proposed fee.  The $14 million fund itself is illusory because Derivative Counsel did not negotiate a separate fund for the Company.  Rather, these proceeds stem from the D&O Insurers, a group that had agreed already to pay on Lucent's directors and officers liability insurance policies to settle other Lucent-related litigation here.  Having not negotiated a separate fund, Derivative Counsel can not claim its negotiations yielded a substantial, monetary benefit for the Company.  Therefore, this factor does not weigh in Derivative Counsel's favor.

### (5) *Gunter* Factor - Risk of Nonpayment

The same, serious risk of nonpayment exists here as in all of the other Lucent-related litigations that participated in the Global Settlement. *See supra* II. Discussion D.1.A.(5)

66

Moreover, Derivative Counsel accepted this case on a contingent basis and thus incurred substantial risk that their efforts would be uncompensated.

### (6) *Gunter* Factor - Amount of Time that Counsel Devoted to Case

Derivative Counsel has devoted 3,626.5 hours to the investigation, prosecution, discovery, and negotiation of this suit. *See Gunter,* 223 F.3d at 195 n. 1 (considering the amount of time spent on the case.)  The parties have produced and reviewed thousands of documents, retained and consulted with investment bankers and other experts, and have involved multiple third parties including Lucent's auditing firm, its outside counsel, counsel for its various insurers, and counsel for its Special Committee and Delaware counsel.  Derivative Counsel obtained expert reports and analyses reflecting the damages and Lucent's ability to pay regarding the claims and the impact of various settlement demands.  They secured, summarized, and analyzed the various insurance policies and underlying discovery documents.   Derivative Counsel researched and prepared various briefs in opposition to Defendants's motions to dismiss.  Derivative Counsel supervised, negotiated, and conducted detailed reviews of corporate books and records produced by Defendants and third party witnesses.  They participated in and assisted the Court and the parties in negotiating the Global Settlement.  Overall, Derivative Counsel represented the continuing interests of Lucent's existing and continuing shareholders.  (Rodriguez Certif. ¶ 2(A)-(I).)  The Court thus determines that their time commitment supports the fee request.

### (7) *Gunter* Factor - Awards in Similar Cases

To evaluate the request for a 25% fee, the Court must consider awards in similar cases. *Gunter,* 223 F.3d at 195 n.1.  The Court is well aware that Derivative Counsel's request falls

within the generally acceptable range for awarding fees in this case and does not challenge that. *See supra* Discussion **Gunter Factor - Awards in Similar Cases**.  But, again, the Court is simply not confined to that range.  *See AremisSoft*, 210 F.R.D. at 133 (citation omitted).  Rather, the particular circumstances of each case must inform the Court's analysis. *Id.*

In so considering, the Court determines that a reduced fee of 17%, or $ 2.38 million, well compensates Derivative Counsel.  A 17% award provides sufficient payment for the efforts undertaken, but also reflects the fact that the results achieved were not extraordinary - indeed, they were largely due to the efforts of others.  For example, the SEC investigation into Lucent was the source of the consent decree requiring various corporate governance changes.  Further, statutory law granted the Board of Directors committees the authority to engage independent counsel and other advisors. *See* 15 U.S.C. § 78j-1(m)(2).  Because Derivative Counsel evaluates its own success largely based on these corporate governance changes, the Court modifies the fee request. Additionally, the Court reduces the fee request because the $14 million fund is artificial, failing to reflect a separate fund negotiated for the Company.  Instead, the $14 million sum is a portion of the D&O Insurers's $148 million payment to the Lucent-related litigations that participated here.  Thus, the appropriate fee award for Derivative Counsel is 17%, or $ 2.38 million.

### B. Application of the Lodestar Recovery Method

The Court cross-checks its result under the percentage-of-recovery method by applying the lodestar method.  The lodestars for the firms are: Greenfield & Goodman, LLC - 372.4 hours, hourly rate of $595, and lodestar of $221,575.00; Schiffrin & Barroway, LLP - 1093.95 hours, hourly rate of $345-$550, and lodestar of $442,283.75; Donovan Searles, LLC - 590.7 hours,

hourly rate of $105-410, and lodestar of $208,741.50; Trujillo Rodriguez and Richards, LLC-
255.6 hours, hourly rate of $105-410, and lodestar of $82,545.50; Weinstein Kitchenoff Scarlatto
Karan & Goldman - 466.3 hours, hourly rate of $100-395, and lodestar of $165,346.50; and
Pomerantz Haudek Block Grossman & Gross LLP - lodestar of $304,735.50.   The total lodestar
for the primary attorneys involved is $1,425,227.75.  Derivative Counsel has submitted a chart
summarizing the hours worked and the lodestars of the principal counsel.  (Rodriguez Certif. ¶ 4
& Ex. A.)  Thus, the Court's calculation represents a 1.67 multiplier.   Since "[m]ultiples ranging
from one to four are frequently awarded in common fund cases when the lodestar method is
applied," *Prudential II*, 148 F.3d at 341 (citations omitted), the Court finds that the award
calculated is appropriate under the lodestar cross-check.

 In sum, the Court determines that the fees award here reflects a careful consideration of
all the *Gunter* factors under the percentage-of-recovery approach and its cross-check under the
lodestar methodology.

### C.  Reimbursement of Expenses and Compensation Requests for Lead Plaintiffs

Derivative Counsel also seeks $70,292.33 for out-of-pocket litigation costs and expenses.
Derivative Counsel has prepared a Summary of Firm Expenses and offered expense reports from
all of the law firms involved in this derivative suit.  Given that their summary of litigation
expenses indicates that the expenses are adequately documented, reasonable, and appropriate for
the litigation of this matter, *see Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir. 1995),
and that no member of the Class has raised any objection to the request, the Court approves
Derivative Counsel's reimbursement request.

In conclusion, the Court awards a fee award of $ 2.38 million.  It also awards a total of

$70,292.33 as reimbursement for expenses and costs incurred in handling this litigation.

**III. Conclusion**

With the fees and expenses determinations now final, the Global Settlement of approximately $563 million will be available finally to class members of various classes who have weathered a dark storm since Lucent Technologies suffered the business and operating difficulties that wreaked havoc on its stock price and nearly compelled the Company to file bankruptcy.   Ultimately, the fact that class members have a recovery in these Lucent-related litigations is further evidence that the Global Settlement is the best outcome for all affected parties.  To this end, the Court greatly praises counsel on both sides for resolving these most complex and time-consuming litigations in a manner that appropriately serves the interests of numerous Lucent investors and employees.

Final Orders and Judgments accompany this Opinion.

Date:   July, 19, 2004                                           S/ JOEL A. PISANO, U.S.D.J.